ATTORNEY FOR APPELLANT
Stacy R. Uliana
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE
Gregory F. Zoeller
Attorney General of Indiana

Stephen Creason
Angela N. Sanchez
Deputy Attorneys General
Indianapolis, Indiana

# In the
# Indiana Supreme Court

No. 33S01-1004-CR-163

GREGORY L. GALLOWAY,

*Appellant (Defendant below)*,

v.

STATE OF INDIANA,

*Appellee (Plaintiff below)*.

Appeal from the Henry Circuit Court, No. 33C01-0710-MR-0002
The Honorable Mary G. Willis, Judge

On Petition to Transfer from the Indiana Court of Appeals, No. 33A01-0906-CR-280

**December 22, 2010**

**Sullivan, Justice.**

Despite nonconflicting expert and lay opinion testimony that defendant Gregory Galloway was insane, the trial court rejected the insanity defense after concluding that the defendant could continue to be a danger to society because of an inadequate State mental health system. This was insufficient to sustain the trial court's finding because there was no probative evidence from which an inference of sanity could be drawn.

**Background**

The defendant, Gregory Galloway, was found guilty but mentally ill for the October, 2007, murder[1] of his grandmother, Eva B. Groves. The defendant raised the "insanity defense"[2] at his bench trial. The trial court found that although the defendant had a long history of mental illness, he did not meet his burden of proving that he was "insane" at the time of the crime.

The trial court concluded, based on the expert testimony and the numerous medical records introduced into evidence, that the defendant suffers from bipolar disorder, an Axis I psychiatric disorder.[3] This evidence showed that prior to his killing his grandmother, the defendant had had a long history of mental illness, and he had had many "contacts" with the mental health system.[4] He had been diagnosed with bipolar disorder by up to twenty different physicians, often with accompanying psychotic and manic symptoms. He had also been voluntarily and involuntarily detained or committed for short-term treatment more than fifteen times.

The defendant was first diagnosed with an Axis I mental illness in 1989, when he was a senior in high school. By 2000, his mental health became more problematic; he had difficulty holding a steady job, he struggled with substance abuse,[5] and his marriage failed. Despite these

---

[1] Ind. Code § 35-42-1-1(1) (2008).

[2] I.C. § 35-41-3-6(a).

[3] Axis I disorders are the mental health disorders recognized by the DSM-IV, except for personality disorders and mental retardation (which are both reported on Axis II). See Am. Psychiatric Ass'n, DSM-IV: Diagnostic and Statistical Manual of Mental Disorders 25-26 (4th ed. 1994). Thus, a finding that the defendant has an Axis I disorder means that he has a recognized mental illness.

[4] The trial court tabulated the defendant's contacts with the mental health system; he has had at least 40 contacts since 1989, but more than 30 occurred after 2000. See Appellant's App. 251-55.

[5] Substance abuse is highly prevalent among people with mental illness, particularly schizophrenia and bipolar disorder. See generally Peter F. Buckley, Prevalence and Consequences of the Dual Diagnosis of Substance Abuse and Severe Mental Illness, 67 J. Clinical Psychiatry (Supp. 7) 5 (2006). The probability of a person with bipolar disorder also having drug-abuse problems "is 11 times greater than in those without bipolar disorder." Darrel A. Regier et al., Comorbidity of Mental Disorders with Alcohol and Other Drug Abuse: Results from the Epidemiologic Catchment Area (ECA) Study, 264 J. Am. Med. Ass'n 2511, 2514-15, 2516 tbl.3, 2517 (1990).

difficulties, he had very few encounters with law enforcement that were not traffic or mental illness related. After his divorce, the defendant moved in with his grandmother, who lived next door to his parents. He had a great relationship with his grandmother; "he loved [her] very much and considered [her to be] his best friend." Appellant's Br. 3; see also Appellant's App. 183; Tr. 40-41, 83-84, 175.

Since 2001, the defendant experienced psychotic episodes with increased frequency and severity. See Galloway v. State, 920 N.E.2d 711, 713-14 (Ind. Ct. App. 2010) (chronicling the defendant's psychotic episodes). For instance, in February, 2002, he was involuntarily committed after his parents found him with a gun and looking for ammunition – he planned to kill his grandmother because she was the devil and he was Jesus Christ, and he planned to kill his neighbor because he believed his neighbor was controlling his son. Then in June, 2004, the defendant drove to Dayton, Ohio, after God told him to leave his job; he was hospitalized in Ohio after being found in a stranger's driveway looking for the perfect wife for the son of God. In July, 2005, the defendant was admitted to a hospital after crashing his car during a car chase with his mother; he believed she was the devil and was chasing her so that he could kill her, and he believed he was protected because he was an alien.

In the year leading up to the murder, the defendant had at least twelve contacts with the mental health system. In January, 2007, he pulled over on the side of the interstate near Lafayette, Indiana, got out of his car, and began erratically yelling and talking to himself. Because the air temperature was 27 degrees, concerned bystanders called the police. When the medics arrived, he was sitting in the back of a police car; his skin was cold to the touch, and there were ice particles in the facial hair under his nose. At the emergency room, the defendant was uncooperative, mumbling to himself, acting aggressively toward staff, and reacting to audio and visual hallucinations; he was admitted to a Lafayette hospital for a few days.

In March, 2007, after refusing to eat or sleep for one week because he was fearful of something bad happening to him, the defendant lacerated his stomach while trying to get into his grandmother's house through a window after he was accidentally locked out. At the emergency room, he was attending to internal stimuli, having difficulty concentrating, and experiencing au-

3

ditory hallucinations and paranoid delusions. He was transferred to an Anderson hospital, where he was confused and disoriented, detached from reality, and in a catatonic-like state; he was discharged after a few days. Several days later, the defendant was involuntarily committed after the court found him to be a danger to himself because he did not know who or where he was, he had been staying awake all night, he had been trying to sleep with his parents in their bed because he believed someone was in his room, and he was hearing voices; again, he was released after a few days.

In June, 2007, the defendant was admitted to a hospital in Tennessee after police found him driving a semi-truck full of gasoline, threatening to blow up a gas station; he was confused and disoriented, responding to internal stimuli and laughing inappropriately, experiencing racing thoughts and auditory hallucinations, and had not slept for three days. He was discharged from the Tennessee hospital within days. A few days later, he went to counseling where he was delusional about raping a girl (there was no evidence that any rape had occurred). He did not take medications prescribed for him in Tennessee.

In the days leading up to the murder, the defendant heard voices and thought that his grandmother's trailer was haunted. To abate his fears, he slept on the floor next to his parents' bed while holding his mother's hand. The night before the murder, he drank a pint of whiskey, finishing around 3:00 or 4:00 a.m., and did not sleep.

The defendant reported feeling strange on October, 26, 2007, the morning of the murder. He was supposed to pick up his friend from work, but he refused to do so because he was feeling strange. When the friend called to ask about the ride, the defendant uncharacteristically yelled at him. The defendant also spoke with his father that morning, and during their conversation, his father became concerned because his son was not acting normal and seemed to be in another world. The defendant told the police that during this conversation, his father was telling him through coded verbal messages that he needed to kill his grandmother.

During the early afternoon, the defendant went shopping with his grandmother and his aunt (the victim's daughter). They shopped for only fifteen minutes and then went to lunch,

4

though the defendant did not eat much. While eating lunch, the defendant began thinking that his grandmother was against him and "that life should be more colorful" and that it would be if she were gone – life would be better again once he killed his grandmother. Appellant's App. 194. He believed that she was the devil, that she was out to get him, and that he needed to kill her to restore his powers. As they sat there eating, he was hoping that his grandmother would die. After lunch, they stopped at a gas station, where the defendant pumped their gas and purchased cigarettes. They returned home a little more than an hour after they had originally left; there had been no arguments, and nothing unusual had occurred during their outing. On the way home, the defendant's grandmother remarked that it had been a wonderful day.

Once they arrived home, the defendant went next door to his parents' house while his grandmother and aunt sat on a couch inside the grandmother's trailer and talked. While at his parents' house, the defendant began believing that he was reading his father's mind; his father was communicating telepathically, telling the defendant that he needed to kill his grandmother "to feel good again[,] to see like the bright lights and the flowers and the pretty things." Appellant's App. 194.

The defendant then went back to his grandmother's house and sat on the porch swing. Shortly thereafter, the defendant's fifteen-year-old son, Cory, arrived and said "hi" to his dad. Cory had seen his father cycle from normal to psychotic before and could tell that something was not quite right. At the same time, the defendant's father, who had come over from next door, was entering the grandmother's house.

The defendant entered the house at the same time as his father and went to his bedroom, grabbed his knife, and came back down the hallway to the living room, where his aunt and grandmother were sitting on a couch. According to his aunt, the defendant had a "wild look" in his eye that she had seen before – it was the look he gets right before he "lose[s] it." Tr. 60. With his father, son, and aunt in the room, and with no plan or motive, the defendant jumped on top of his grandmother, straddled her, and stabbed her in the chest while yelling "you're going to die, I told you, you're the devil." Tr. 50, 74-75. His father yelled, "What have you done!," and the defendant responded that she "was going to kill me." Tr. 86.

5

As soon as everyone started screaming, the defendant realized that he did not feel better like he thought he would, and he hoped that his grandmother would survive. His father was able to commandeer the knife and store it in a safe place until the police arrived. As the defendant's son applied pressure to the wound, the defendant told his grandmother that he loved her and that he did not mean to do it. He pleaded for the paramedics to save his grandmother's life. When the police arrived, he told them that he loved his grandmother and would not hurt her. When the police were getting ready to take him to the police station, he did not understand what was happening and asked where he was going. But he was cooperative during the police interrogation, which occurred two-and-a-half hours later.

Prior to trial, the defendant was examined by three experts: Dr. Parker, a psychiatrist engaged by the defense; Dr. Coons, a court-appointed psychiatrist; and Dr. Davidson, a court-appointed psychologist. All three experts agreed that he suffers from a mental illness, suffers paranoid delusions (a symptom of severe psychosis), and has suffered from intermittent psychosis since 1999. Dr. Parker and Dr. Coons both testified (and submitted in their preliminary reports) that the defendant was legally insane at the time of the murder. They both opined that he was jolted out of his delusion when he realized that he did not feel better and had just harmed someone he loved. The psychologist, Dr. Davidson, submitted a preliminary opinion to the court that the defendant was sane at the time of the murder. The basis for his opinion was that it was unlikely the defendant would have been insane only for the few moments that it took for him to grab the knife and stab his grandmother. But while testifying, Dr. Davidson withdrew his opinion in light of additional facts that he did not have when he submitted his preliminary opinion. Among other things, Dr. Davidson was unaware that the defendant had been experiencing delusions and responding to internal stimuli in the days leading up to the murder and on the day of the murder. Dr. Davidson also was unaware that eyewitnesses heard the defendant call his grandmother the devil as he stabbed her. After being presented with all of the facts while on the witness stand, Dr. Davidson ultimately testified that he could not give an opinion on the matter.

After the close of trial, but before a verdict was rendered, the defendant stopped taking his medication and deteriorated to the point where he was found incompetent to stand trial. He regained competence after treatment at a state mental hospital.

On May 4, 2009, the trial court found the defendant guilty but mentally ill for murdering his grandmother, rejecting the insanity defense. Finding that none of the experts or lay witnesses testified that the defendant was sane, the trial court based its conclusion on demeanor evidence. Specifically, the court found that the defendant and his grandmother had interacted with each other and other people on the day of the murder, he had committed the offense in front of several family members and made no effort to conceal his crime, he had not attempted to evade police, and he had cooperated with law enforcement. Additionally, the defendant had been alert and oriented throughout the trial proceedings and had been able to assist counsel. The court also found that the defendant's "psychotic episodes increased in duration and frequency" and that he "lacks insight into the need for his prescribed medication." Appellant's App. 255. The court then found that the defendant had "repeatedly discontinued medication because of side effect complaints and would self medicate" by abusing alcohol and illicit drugs. Id. Furthermore, there was "no evidence that this pattern of conduct [would] not continue if the Defendant [were] hospitalized and released, posing a danger to himself and others in the community." Id. The court concluded that the defendant "is in need of long term stabilizing treatment in a secure facility." Id.

During the sentencing hearing, on June 2, 2009, the trial court indicated that the preferred route would be to commit the defendant to a mental health facility for the rest of his life but concluded that route was not an option.

> There is absolutely no evidence that this mental illness is [feigned], or malingered, or not accurate and there is no dispute as to that. But quite frankly, this is a tragedy that's ripped apart a family and there is very little this Court can do to remedy that. This case is as much a trial of our mental health system as it is of a man. For 20 years, Mr. Galloway's family has sought long-standing permanent treatment for Mr. Galloway, and the fact that there may not be the funds available to pay for the mentally ill in the State of Indiana does not mean that we don't have mentally ill people in the State of Indiana. . . . [T]his is difficult for everyone[,] and I can pick apart about 20 mental health records that were submitted to this

7

Court where I would have begged a mental health provider to keep Mr. Galloway long term in a civil commitment, but they have not. Mr. Galloway is able to take his medication when forced to do so in a very structured setting, but we have a 20-year history which shows when he is not in that setting that he will not take his medication, that he will continue to have episodes[,] and most concerning for this Court is that he will endanger others and himself. One of my options is not to say that he's committed for the rest of his life in a mental health institution. That would have been easy, but that's not one of my choices. . . . I cannot in good conscience allow someone with the severe mental health illness to return to the community[,] and that is what has made this case so very difficult.

Tr. 389-91. After considering the aggravating and mitigating factors under Weeks v. State, 697 N.E.2d 28, 30 (Ind. 1998), the court sentenced the defendant to 50 years imprisonment.

The Court of Appeals affirmed the defendant's conviction, holding that this Court's decision in Thompson v. State, 804 N.E.2d 1146 (Ind. 2004), compelled such a result. Galloway, 920 N.E.2d at 720. The Court of Appeals interpreted Thompson as holding that where a defendant appeals claiming that his insanity defense should have prevailed, the conviction must be affirmed "if there is any evidence whatsoever supporting the verdict, no matter how slight." Id.

The defendant sought, and we granted, transfer, Galloway v. State, 929 N.E.2d 790 (Ind. 2010) (table), thereby vacating the opinion of the Court of Appeals, Ind. Appellate Rule 58(A).

**Discussion**

**I**

To sustain a conviction, the State must prove each element of the charged offense beyond a reasonable doubt. See I.C. § 35-41-4-1(a); see also In re Winship, 397 U.S. 358, 364 (1970). Even where the State meets this burden, a defendant in Indiana can avoid criminal responsibility by successfully raising and establishing the "insanity defense."[6] See I.C. § 35-41-3-6(a). A suc-

---

[6] The rationale underlying the insanity defense is that a legally insane person is unable to form the requisite criminal intent. See Truman v. State, 481 N.E.2d 1089, 1089-90 (Ind. 1985) ("the inability to form intent by reason of insanity" is a defense to crime in Indiana).

8

cessful insanity defense results in the defendant being found not responsible by reason of insanity ("NRI"). See I.C. §§ 35-36-2-3, -4.

The defendant bears the burden of establishing the insanity defense by a preponderance of the evidence.[7] I.C. § 35-41-4-1(b). To meet this burden, the defendant must establish both (1) that he or she suffers from a mental illness and (2) that the mental illness rendered him or her unable to appreciate the wrongfulness of his or her conduct at the time of the offense.[8] See I.C. § 35-41-3-6(a). Thus, mental illness alone is not sufficient to relieve criminal responsibility. See Weeks v. State, 697 N.E.2d 28, 29 (Ind. 1998). Rather, a defendant who is mentally ill but fails to establish that he or she was unable to appreciate the wrongfulness of his or her conduct may be found guilty but mentally ill ("GBMI").[9] See, e.g., Taylor v State, 440 N.E.2d 1109, 1112 (Ind. 1982).

---

[7] "Preponderance of the evidence" means "[t]he greater weight of the evidence, not necessarily established by the greater number of witnesses testifying to a fact but by evidence that has the most convincing force." Black's Law Dictionary 1301 (9th ed. 2009). Thus, a defendant must convince the trier of fact that, in consideration of all the evidence in the case, he or she was more probably legally insane than legally sane at the time of the crime. See Gambill v. State, 675 N.E.2d 668, 676 (Ind. 1996).

[8] Indiana Code section 35-41-3-6 provides that a person is not criminally responsible for engaging in criminal acts "if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense," and it defines a "mental disease or defect" as a "severely abnormal mental condition that grossly and demonstrably impairs a person's perception."

[9] The results of an NRI verdict and of a GBMI verdict are different. When an NRI verdict is rendered, the prosecutor is required to initiate a civil commitment proceeding under either section 12-26-6-2(a)(3) (temporary commitment) or section 12-26-7 (regular commitment) of the Indiana Code. See I.C. § 35-36-2-4. The defendant remains in custody pending the completion of the commitment proceeding. Id. The trial court may order the defendant committed if it finds by clear and convincing evidence that the defendant is currently mentally ill and either dangerous or gravely disabled. See Deal v. State, 446 N.E.2d 32, 34 (Ind. Ct. App. 1983) (citing Addington v. Texas, 441 U.S. 418, 425-33 (1979)), trans. denied. But see Foucha v. Louisiana, 504 U.S. 71, 87-88 (1992) (O'Connor, J., concurring) (stating that it might be permissible for a state "to confine an insanity acquittee who has regained sanity if . . . the nature and duration of detention were tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness"); Jones v. United States, 463 U.S. 354, 361-70 (1983) (holding that a defendant who successfully establishes the insanity defense may be committed to a mental institution on the basis of the insanity judgment alone).

Unlike an NRI verdict, a GBMI verdict is a conviction. See I.C. § 35-36-2-5(a). The trial court sentences a GBMI defendant "in the same manner as a defendant found guilty of the offense," id., but the full consequences of a GBMI verdict are different from the consequences of a guilty verdict. See Georgopolus v. State, 735 N.E.2d 1138, 1141 (Ind. 2000). Specifically, a physician must evaluate the GBMI

Whether a defendant appreciated the wrongfulness of his or her conduct at the time of the offense is a question for the trier of fact. Thompson v. State, 804 N.E.2d 1146, 1149 (Ind. 2004). Indiana Code section 35-36-2-2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity.[10] Such expert testimony, however, is merely advisory, and even unanimous expert testimony is not conclusive on the issue of sanity. Cate v. State, 644 N.E.2d 546, 547 (Ind. 1994). The trier of fact is free to disregard the unanimous testimony of experts and rely on conflicting testimony by lay witnesses. Barany v. State, 658 N.E.2d 60, 63 (Ind. 1995). And even if there is no conflicting lay testimony, the trier of fact is free to disregard or discredit the expert testimony. Thompson, 804 N.E.2d at 1149.

Because it is the trier of fact's province to weigh the evidence and assess witness credibility, a finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts. See Barany, 658 N.E.2d at 63. A defendant claiming the insanity defense should have prevailed at trial faces a heavy burden because he or she "is in the position of one appealing from a negative judgment." Thompson, 804 N.E.2d at 1149. A court on review will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact (even though "more reasonable" inferences could have been made). Id. at 1149-50.

Although this standard of review is deferential, it is not impossible, nor can it be. The Indiana Constitution guarantees "in all cases an absolute right to one appeal." Ind. Const. art. VII, § 6. An impossible standard of review under which appellate courts merely "rubber stamp" the fact finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory. Cf. Serino v. State, 798 N.E.2d 852, 856 (Ind. 2003) (standard of review for sentencing claims so high that it risked impinging

---

defendant before sentencing, and the defendant must be appropriately treated and evaluated once in the Department of Correction's custody. Id. (citing I.C. § 35-36-2-5(b), (c)).

[10] The trial court is required to appoint two or three disinterested experts to examine the defendant and testify at trial as the court's witnesses, after the State and the defendant have both presented their respective cases. I.C. § 35-36-2-2(b). Additionally, the State and the defense may each employ its own expert(s) to testify along with the court's witnesses. Id.

upon the constitutional right to appeal). As such, this Court has long held that where the defendant claims the insanity defense should have prevailed, the conviction will be set aside "when the evidence is <u>without conflict</u> and leads only to the conclusion that the defendant was insane when the crime was committed." <u>Thompson</u>, 804 N.E.2d at 1149 (emphasis added); <u>see</u> <u>also</u> <u>Barany</u>, 658 N.E.2d at 63-64 (citation omitted).

## II

We have on several occasions addressed a defendant's claim that his or her insanity defense should have prevailed at trial because of nonconflicting expert testimony that the defendant was insane at the time of the crime. Each time we have upheld the conviction(s) because the evidence as to the defendant's insanity was in conflict and thus sufficient to sustain the trier of fact's determination of sanity. <u>See, e.g.</u>, <u>Thompson</u>, 804 N.E.2d 1146; <u>Gambill v. State</u>, 675 N.E.2d 668 (Ind. 1996); <u>Barany</u>, 658 N.E.2d 60; <u>Cate</u>, 644 N.E.2d 546; <u>Rogers v. State</u>, 514 N.E.2d 1259 (Ind. 1987); <u>Green v. State</u>, 469 N.E.2d 1169 (Ind. 1984). That is, in each of the cases where there has been nonconflicting expert opinion testimony that a defendant was insane, there has been other sufficient probative evidence from which a conflicting inference of sanity reasonably could be drawn. <u>See</u> <u>Thompson</u>, 804 N.E.2d at 1152 (Sullivan, J., concurring).

## A

The strongest showing of an evidentiary conflict occurs where the experts disagree as to whether the defendant was insane at the time of the offense. Our cases have consistently held that conflicting credible expert testimony is sufficiently probative of sanity. <u>See, e.g.</u>, <u>Robinette v. State</u>, 741 N.E.2d 1162, 1167 (Ind. 2001); <u>Weeks</u>, 697 N.E.2d at 29; <u>Metzler v. State</u>, 540 N.E.2d 606, 610 (Ind. 1989); <u>Smith v. State</u>, 502 N.E.2d 485, 490 (Ind. 1987); <u>Reed v. State</u>, 479 N.E.2d 1248, 1253 (Ind. 1985). Such a conflict arises where one or several experts opine that the defendant was insane at the time of the offense, while one or several other experts opine that the defendant was sane at the time of the offense.

A conflict does not exist, however, where one or several experts testify that the defendant was insane at the time of the offense and another expert testifies that he or she is unable to give an opinion as to the defendant's sanity at the time of the offense.

In Green, three of four experts testified that the defendant was insane at the time of the crime. 469 N.E.2d at 1172. The fourth expert testified that the defendant met only one of the requirements of insanity under then-applicable law, but he could not form an opinion as to the second. Id. Even though there was no actual conflict in the expert testimony, we affirmed the conviction because the "other evidence" presented to the jury was sufficient to support its finding that the defendant was sane at the time of the crime.[11] Id. Similarly, in Rogers, the court-appointed expert testified that the defendant was insane at the time of the crime, while the defendant's expert testified that he could not render an opinion on the matter. 514 N.E.2d at 1261. Although there was no actual conflict in the experts' testimony, this Court once again affirmed the conviction based on the conflict presented by the lay testimony. Id. The Court cited Green for the proposition that a jury may reject expert testimony of insanity and rely upon lay testimony that the defendant was sane at the time of the crime. Id. Like Green, the conflicting evidence that provided sufficient grounds for the jury's finding of sanity was based on a conflict between lay testimony and expert testimony, not a conflict between experts.[12] Id.

Moreover, as a matter of law, a person is either sane or insane at the time of the crime; there is no intermediate ground. Marley v. State, 747 N.E.2d 1123, 1128 (Ind. 2001) (quoting Cowell v. State, 263 Ind. 344, 331 N.E.2d 21, 24 (1975) (providing that "complete mental inca-

---

[11] The "other evidence" included testimony from a detective that, based on his interactions with the defendant, in his lay opinion the defendant was sane. Green, 469 N.E.2d at 1172.

> Moreover . . . . [a]fter beating her daughter with the skillet, Defendant changed her clothing, told her daughter's schoolmate that [the victim] was not going to school, packed a suitcase, ripped a page from an address book bearing the name of a friend in Chicago, withdrew money from the bank, purchased a bus ticket, and went to her friend's house.

Id.

[12] In Rogers, there was lay testimony that although the defendant "had a 'weird' facial expression" earlier in the day, his speech and actions were "calmer" and he was not acting "crazy" at the time of the crime. 514 N.E.2d at 1261.

pacity must be demonstrated before criminal responsibility can be relieved")). The trier of fact therefore has one of only two options with regard to insanity. And its decision must be based on probative evidence, which means "[e]vidence that tends to prove or disprove a point in issue." Black's Law Dictionary 639 (9th ed. 2009). An expert witness who is called to testify as to his or her opinion, in an effort to aid the trier of fact, and who testifies that he or she has no opinion does not provide probative evidence.

## A-2

The expert testimony in this case did not conflict. Although Dr. Davidson submitted a preliminary report opining that the defendant was sane at the time of the murder, he recanted that opinion under cross-examination in light of learning critical facts. The State contends that Dr. Davidson's equivocation illustrates that the expert testimony was in conflict. We disagree.

First, the State's argument is not consistent with our prior cases. Both Green and Rogers involved an expert who was unable to form an opinion as to the defendant's sanity. We affirmed the convictions in both cases only because there was conflicting lay evidence. Under the State's view that no opinion represents a conflicting opinion, both Green and Rogers could have been affirmed without a discussion of the lay evidence, given our consistent holdings as to the value and sufficiency of conflicting expert testimony.

Second, the trial court's findings preclude the possibility of a true conflict in the expert testimony because it did not give any weight to the expert testimony in this case. Rather, the trial court focused its analysis on demeanor evidence to support its finding that the defendant was guilty but mentally ill. It mentions the experts only once, as a preface to its finding that the defendant meets the definition of "mentally ill," and merely states that "[e]ach of the examining doctors . . . were divided on the issue of insanity." Appellant's App. 258. Given the consistent holdings of this Court with respect to the strength of conflicting expert testimony in sustaining a finding of sanity, and given the trial court's analysis in this case, the trial court clearly did not make a finding that the expert testimony was in conflict. Thus, the experts' testimony about the defendant's insanity at the time of the crime did not conflict.

**B**

Where there is no conflict among the expert opinions that the defendant was insane at the time of the offense, there must be other evidence of probative value from which a conflicting inference of sanity can be drawn. See Thompson, 804 N.E.2d at 1152 (Sullivan, J., concurring). Such probative evidence is usually in the form of lay opinion testimony that conflicts with the experts or demeanor evidence that, when considered in light of the other evidence, permits a reasonable inference of sanity to be drawn.

**B-1**

In many cases, there will be lay opinion testimony that the defendant was sane at the time of the crime. Credible and informed lay opinion testimony as to the defendant's mental state at the time of the crime may be sufficiently probative to support a trier of fact's determination of sanity, even where there is unanimous expert testimony to the contrary. See, e.g., Barany, 658 N.E.2d at 64; Green, 469 N.E.2d at 1172. Lay witnesses who are familiar with and observe the defendant at or around the time of the crime reasonably may be able to give a more accurate account of the defendant's mental state at the time of the crime than experts who examine the defendant months later. See Thompson, 804 N.E.2d at 1149.

For instance, in Gambill, we affirmed the conviction of a mother convicted of murdering her son because there was lay opinion testimony that conflicted with the unanimous expert testimony. 675 N.E.2d 668. One of the officers who spent time with the defendant at the hospital in the immediate aftermath of her arrest had attended high school with the defendant, and based on his familiarity with her and his observations of her on the day of the murder, he testified that, in his lay opinion, she was able to appreciate the wrongfulness of her conduct at the time of the crime. Id. at 672; see also Green, 469 N.E.2d at 1172. A jail-house informant with whom the defendant discussed the murder also testified that she believed the defendant was able to appreciate the wrongfulness of her conduct at the time of the murder. Gambill, 675 N.E.2d at 671-72. Additionally, the defendant made several self-serving exculpatory statements during the imme-

14

diate aftermath of the murder – namely, she did not tell medical personnel of her heavy drug use that day, and she told a motorist who gave her a ride that she had been raped and that her former boyfriend had hurt her son. Id. at 672-73.

### B-2

Even where there is no conflict among the experts and the lay witnesses, a finding that a defendant was sane at the time of the crime still may be sustained by probative demeanor evidence from which a conflicting inference of sanity may be drawn. See Thompson, 804 N.E.2d at 1149. We have recognized the importance of demeanor evidence in insanity cases. Demeanor is useful because a defendant's "behavior before, during, and after a crime may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later." Id. (citing Barany, 658 N.E.2d at 64).

Demeanor evidence may be most useful where there is some indication that the defendant is feigning mental illness and insanity. E.g., Thompson, 804 N.E.2d 1146; Cate, 644 N.E.2d 546. In Thompson, we affirmed the defendant's conviction for residential entry because there was sufficient evidence of probative value to sustain the trial court's finding that the defendant was not insane at the time of the crime. 804 N.E.2d at 1150. For instance, the defendant removed only her possessions once she entered the victim's residence, which reasonably suggested that she was aware that it was wrong to take things that did not belong to her. Id. at 1148. Moreover, as she fled from the scene of the crime, she was stopped momentarily by police but allowed to leave, which reasonably suggested that she was sufficiently lucid to continue about her business. Id. Thompson had also recently been discharged from the hospital with "no active psychotic symptoms . . . and was calm and pleasant without agitation." Id. at 1150. Finally, Thompson had a history of lying and "avoiding criminal responsibility through her illness." Id. Based on all of the probative evidence, the trial judge concluded that Thompson "knew her actions were wrong but was using her illness to manipulate the system." Id.; see also Cate, 644 N.E.2d at 547-48 (affirming the defendant's conviction because of inconsistencies in his story, which suggested feigning, and because there was probative demeanor evidence of defendant's lucidity upon arrest).

15

To be sure, demeanor evidence may be appropriate in cases where there is no evidence of feigning. For instance, the defendant in <u>Barany</u> was found by all three experts to have been legally insane at the time of the crime, but we affirmed his murder conviction because there was conflicting evidence of sanity given by lay witnesses. 658 N.E.2d at 64. Specifically, an investigating police detective testified that the defendant "talked about the victim's complaints and nagging" only a few hours after the crime. <u>Id.</u> Additionally, one of the defendant's friends testified that although the defendant engaged in unusual topics of conversation, he "seemed O.K." <u>Id.</u> Finally, the defendant told his sister that he believed the victim was calling the police when he killed her. <u>Id.</u> We concluded that "[t]he jury could have decided that this testimony about [the defendant's] behavior was more indicative of his actual mental health at the time of the killing than medical examinations conducted four weeks after the arrest." <u>Id.</u>

Although demeanor evidence often is useful, there are limits to its probative value. First, demeanor evidence is of more limited value when the defendant has a long history of mental illness with psychosis. As the Court of Appeals previously explained:

> While the jury is the ultimate finder of fact, we fail to see how evidence of a defendant's demeanor before and after a crime can have much probative value when a schizophrenic defendant is involved. . . .
>
> . . . .
>
> The proposition that a jury may infer that a person's actions before and after a crime are "indicative of his actual mental health at the time of the" crime is logical when dealing with a defendant who is not prone to delusional or hallucinogenic episodes. However, when a defendant has a serious and well-documented mental disorder, such as schizophrenia, one that causes him to see, hear, and believe realities that do not exist, such logic collapses. . . .

<u>Moler v. State</u>, 782 N.E.2d 454, 458-59 (Ind. Ct. App. 2003), <u>trans.</u> <u>denied</u>, 792 N.E.2d 43 (Ind. 2003) (table). Demeanor evidence requires the trier of fact to infer what the defendant was thinking based on his or her conduct. The trier of fact uses its common knowledge of what is normal and what is abnormal to make these inferences. But insanity is not limited to the stereo-

16

typical view of a "raging lunatic" – a person experiencing a psychotic delusion may appear normal to passersby.

Second, Indiana's insanity test is a purely cognitive test – it asks only what the defendant was thinking and whether he or she could appreciate the wrongfulness of his or her conduct. At one time, Indiana included, as a second basis for insanity, whether a defendant had the capacity to conform his or her conduct to the law – i.e., the irresistible impulse test. Green, 469 N.E.2d at 1171 (citing Ind. Code § 35-41-3-6(a) (Burns 1979)). This volitional component was removed from the statute in 1984. See Act of Feb. 24, 1984, No. 184, § 1, 1984 Ind. Acts 1501, 1501. Demeanor evidence thus had more probative value to negate a defense of insane conduct because of the volitional component of the insanity test. See, e.g., Taylor, 440 N.E.2d 1109.

Finally, demeanor evidence before and after a crime is of more limited value than the defendant's demeanor during the crime. The insanity defense concerns the defendant's mental state at the time of the crime. As such, Indiana law recognizes the defense of "temporary insanity." Gambill, 675 N.E.2d at 674-75; Flowers v. State, 236 Ind. 151, 139 N.E.2d 185, 196 (1956). The law thus allows for the possibility that a defendant will be legally insane at the time of the crime, but compos mentis immediately before and immediately after the crime. Therefore, a defendant's demeanor before and after a crime may be even less indicative of the defendant's mental state during the crime than demeanor evidence normally is.

Thus, as a general rule, demeanor evidence must be considered as a whole, in relation to all the other evidence. To allow otherwise would give carte blanche to the trier of fact and make appellate review virtually impossible. For instance, in Thompson and Gambill, the trial courts found that the defendant's flight from police was probative of sanity. But in Lyon v. State, the fact that the defendant did not flee but rather waited for police in the next room was probative of sanity. 608 N.E.2d 1368, 1369-70 (Ind. 1993). If a piece of demeanor evidence standing alone is considered probative, evidence of the defendant's actions after the crime could be used as the sole basis for a finding of sanity, whether the defendant cooperated with police or not.

17

## C

In this case, there was not sufficient evidence of probative value from which an inference of sanity could be drawn sufficient to create a conflict with the (nonconflicting) expert testimony that the defendant was insane at the time of the offense. First, there was no lay opinion testimony given that conflicted with the experts' opinions that the defendant was insane at the time of the stabbing. The three eyewitnesses to the stabbing called by the State testified that the defendant was showing familiar signs of "losing it." The defendant's aunt, who was sitting on the couch as her mother was stabbed only a few feet away, testified that the defendant had a "wild look" in his eye and that she recognized this as the look he gets right before he loses it. She also heard the defendant call his beloved grandmother the devil as he stabbed her. Two other witnesses – the defendant's mother and the defendant's friend – also testified that the defendant was showing signs of losing it in the days and hours leading up to the murder. Thus, unlike Thompson, where there was no lay opinion evidence on the issue of insanity, there were five lay witnesses in this case whose testimony supports the experts' opinions.

Second, there was not sufficient demeanor evidence of probative value from which an inference of sanity could be drawn. The trial court based its findings on very little evidence. It found as probative of sanity the fact that, over the course of an hour, the defendant shopped, ate, and filled a car with gasoline without incident. It also found as probative the fact that the defendant cooperated with police after the fact. Viewed in isolation, each of these events may indeed represent the normal events of daily life. However, when viewed against the defendant's long history of mental illness with psychotic episodes, the defendant's demeanor during the crime, as testified to by three eyewitnesses, and the absence of any suggestions of feigning or malingering, this demeanor evidence is simply neutral and not probative of sanity.

Additionally, we are unable to agree with the trial court's conclusions that certain facts were probative of sanity. Two investigating officers testified that there was absolutely no evidence of a plan or motive. In light of this, the trial court found as probative of sanity the fact that the defendant, without any warning, stabbed his grandmother, his best friend with whom he had lived for seven years, in front of three family members while calling her the devil. We see noth-

18

ing connecting the absence of plan or motive and the defendant acting without warning as he did as probative of sanity.

The trial court also found as probative of sanity the fact that the defendant deteriorated during trial to the point that he was deemed legally incompetent and was committed to a state hospital to regain competence. We do not find the defendant's deteriorating to incompetence to stand trial to be probative of his sanity at the time of the offense.

The trial court expressly found that the defendant deteriorates mentally and experiences psychosis when he does not take his medication. At the time of the stabbing, the defendant was supposed to be taking his medications twice a day. He told police, however, that he had not taken any prescription medication in two days. The trial court found this failure to take medication to be probative of sanity, but we do not, especially in light of the trial court's finding that the defendant became psychotic when not on his medication.

The trial court also relied on the defendant's demeanor during trial, when he was competent to stand trial, as probative of his sanity at the time of the crime. As discussed at length supra, a defendant's demeanor during court proceedings is certainly probative of sanity with regard to his or her competence to stand trial. See Manuel v. State, 535 N.E.2d 1159, 1162 (Ind. 1989) (per curiam). But the probative value of a defendant's courtroom demeanor during trial as to his or her mental state at the time of the crime is doubtful. The justification for considering a defendant's demeanor before and after the crime is that conduct occurring in temporal proximity to the crime "may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later." Thompson, 804 N.E.2d at 1149. Trial proceedings, however, often occur many months or even years after the crime. In this case, the two-day bench trial occurred nearly a year after the murder. Thus, we do not find the fact that the defendant "was alert and oriented throughout the proceedings and assisted his counsel and the investigator" to be probative of his sanity at the time of the crime.

19

Finally, unlike <u>Thompson</u> and <u>Cate</u>, where there were suggestions of feigning or malingering, there is no evidence or suggestion that the defendant here feigned his mental illness. The trial court expressly found as much with regard to defendant's long history of mental illness.

**III**

Because the insanity defense relieves a defendant of criminal responsibility, even where it is established beyond a reasonable doubt that he or she committed the criminal act, there is an inherent risk of abuse. We are mindful of these risks, which is why substantial deference is given to the trier of fact's finding of sanity. The trier of fact is in the best position to judge the credibility of the witnesses and to observe the defendant over a period of time. Accordingly, whether a defendant is malingering or feigning mental illness or insanity is clearly an appropriate consideration for the trier of fact. <u>See</u> Part II.B, <u>supra</u>.

It was not appropriate, however, for the trier of fact to consider the condition of our State's mental health system. Although raising the insanity defense opens the door to examining the defendant's entire life and allows in evidence that might otherwise be inadmissible under our rules of evidence, <u>see</u> <u>Garner v. State</u>, 704 N.E.2d 1011, 1014 (Ind. 1998), what may or may not happen to the defendant in the future cannot be considered. The trier of fact must make its determination as to whether the defendant was insane at the time of the offense using only evidence and considerations that are relevant[13] to the defendant's mental state at the time of the offense.

The insanity defense may not be a constitutional mandate, <u>see</u> <u>Clark v. Arizona</u>, 548 U.S. 735, 748-49 (2006), but it dates back to the twelfth century, <u>see</u> Francis Bowes Sayre, <u>Mens Rea</u>, 45 Harv. L. Rev. 974 (1932). Prior to the twelfth century, criminal law was based on principles of strict liability – the only inquiry was whether the criminal defendant committed the criminal act. <u>See</u> Sayre, <u>supra</u>, at 977. Toward the end of the twelfth century, the influences of ancient Roman law and canon law began to call into question the morality of punishing someone for a criminal act committed without criminal intent. <u>See</u> <u>id.</u> at 982-84. Insanity, like self-defense,

---

[13] Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Ind. Evidence Rule 401.

thus became a basis for a royal pardon wherein the insane defendant was convicted of the charged offense but pardoned by the King. See id. at 1004-05.

Over the centuries, insanity became a defense to criminal responsibility. See, e.g., 4 William Blackstone, Commentaries on the Laws of England 24-25 (1769). Arguably the most clear and influential statement of the insanity defense came from the House of Lords in M'Naghten's Case, (1843) 8 Eng. Rep. 718 (H.L.). It was there held that the common law test for insanity had been and was "whether the accused at the time of doing the act knew the difference between right and wrong." Id. at 722. That is, a defendant was not criminally responsible if, at the time of the offense, he was unable to appreciate the wrongfulness of his conduct.

The insanity defense has undergone many changes since the mid-nineteenth century. One of the most significant was the development of the irresistible impulse test, which recognized volitional impairment as a basis for the insanity defense, and the subsequent expansion of both the cognitive and volitional tests embodied in the Model Penal Code. See Christopher Slobogin, An End to Insanity: Recasting the Role of Mental Disability in Criminal Cases, 86 Va. L. Rev. 1199, 1211-12 (2000). Although many states, including Indiana, adopted some variation of the broader insanity defense during the 1960s and 1970s, most states repealed the volitional test after John Hinckley was found not guilty by reason of insanity for the attempted assassination of President Ronald Reagan in the early 1980s. See id. at 1214. Since then, many states, like Indiana, have reverted back to the original common law insanity test described in M'Naghten. Id. In fact, several states have abolished the insanity defense completely. See, e.g., Idaho Code Ann. § 18-207 (2004); Kan. Stat. Ann. § 22-3220 (2007); Mont. Code Ann. § 46-14-102 (2009).[14]

The Indiana General Assembly has chosen to return to our common law roots and hold criminally responsible only those defendants who are morally responsible for their actions. Judges must apply that law and find not responsible by reason of insanity those defendants who establish each component of the insanity defense by a preponderance of the evidence. It is not

---

[14] Nevada also abolished the insanity defense, see Act of July 5, 1995, ch. 637, § 5, 1995 Nev. Stat. 2448, 2450, but the Nevada Legislature reinstated the defense in 2003, see Act of May 28, 2003, ch. 284, § 4, 2003 Nev. Stat. 1456, 1457 (codified as amended at Nev. Rev. Stat. Ann. § 174.035 (West Supp. 2010)).

for the judicial branch to decide that a legally insane defendant should be convicted and sentenced to prison because of the condition of the State's mental health system.

The trial court erred in this case by entering a verdict of guilty but mentally ill when the evidence presented reasonably led only to a conclusion that the defendant was legally insane at the time of the offense. Underlying the trial court's decision was not a concern of malingering or feigning but a concern about the State's mental health system and the defendant's need for structure and constant supervision. Among the trial court's findings is that the defendant "lacks insight into the need for his prescribed medication" and "is in need of long term stabilizing treatment in a secure facility." The trial court also found that the defendant "repeatedly discontinued medication" and there was "no evidence that this pattern of conduct will not continue if [the defendant] is hospitalized and released, posing a danger to himself and others in the community."

Though made after the verdict, the trial court's statements at sentencing cast light on the rationale underlying the verdict.[15] The trial court confessed at sentencing that it viewed "[t]his case . . . as much a trial of our mental health system as . . . of a man." The court lamented that it could not simply commit the defendant to a mental health institution for the rest of his life – the "easy" decision. What made the court's decision so difficult was that it could not "in good conscience allow someone with . . . severe mental illness to return to the community."

To be sure, the trial court was not unreasonable in finding that the defendant's history of mental illness, his lack of insight into the need for medication, and his track record of mentally deteriorating after stopping his medication creates a high probability that the defendant will be a danger to himself and to others in the community if treated and released. Although such considerations may be relevant and appropriate during a commitment proceeding, they are not relevant or appropriate in determining whether the defendant was legally insane at the time of the offense. Thus, while we sympathize with the difficulty of the trial court's decision, we cannot sustain it.

_____

[15] We have previously considered the trial court's sentencing statements as illustrative of its reasoning with regard to the verdict, at least where the trial court was both the trier of law and the trier of fact. See Thompson, 804 N.E.2d at 1150.

## Conclusion

We reverse the judgment of the trial court.

Rucker and David, JJ., concur.

Shepard, C.J., dissents with separate opinion in which Dickson, J., joins.

SHEPARD, Chief Justice, dissenting.

Gregory Galloway is someone who went shopping at a going-out-of-business sale in the morning, had some lunch at a local restaurant with his aunt and grandmother, and stopped off at a gas station to buy fuel and cigarettes. Galloway appeared normal all day; "everybody was happy," one of his companions said.

When Galloway arrived home, he stabbed his grandmother to death, and then immediately announced that he regretted what he had done. The finder of fact in this case, Judge Mary Willis, concluded on the basis of the admitted evidence that Galloway was not insane at the time of the crime, that is to say, that he knew killing his grandmother was wrong.

Of course, all of the testimony by psychiatrists and psychologists necessarily came from witnesses who were not present at the scene of the crime. They offered their observations based on records of Galloway's medical history from moments other than the hour of the killing and on direct observations of Galloway that occurred months or even years after the crime. One of these experts, Dr. Glenn Davidson, appointed by the court, concluded that Galloway was not insane at the time of the crime. Eyewitness evidence about how Galloway acted before and after the crime also supported the trial court's decision.

This was one of those cases where the defense argued that the perpetrator was sane right before the crime and sane right after the crime, but insane for the sixty seconds or so it took to commit it. Dr. Davidson's basic view was that it was unlikely that Galloway qualified as insane on the basis of a "very thin slice of disorganized thinking." (Tr. at 228.)

Defense counsel's vigorous cross-examination confronted Dr. Davidson with a host of hypotheticals ("now what if I told you") and asked as to each new proposed fact whether it would affect his diagnosis. It was twenty to thirty pages of the sort of energetic cross-examination tactics to which we lawyers are inured but which often befuddle the uninitiated. It finally left the witness saying, in the face of this onslaught, that he was unsure.

As the majority points out, juries and judicial factfinders are not required to take as completely true all or none of what witnesses say. They are entitled to believe and disbelieve some, all, or none of the testimony of experts and non-experts alike. Indeed, their assignment is to sort out truth from cacophony. It was altogether plausible that Judge Willis could credit Dr. Davidson's opinion that Galloway was sane and treat the doctor's answers under cross as less compelling. She could also, of course, give weight to Galloway's own contemporaneous declaration of regret right after he killed his grandmother.

To be sure, if the right of appeal is to be meaningful, both trial and appellate judges must be open to the possibility of mistake. We set a pretty tough standard for trial judges as to casting aside jury verdicts, for example, saying that they may do only when the jury's verdict is "against the weight of the evidence" or "clearly erroneous." Ind. Trial Rule 59(J). Our rules require that the judge who sets aside a jury verdict explain in detail, if you will, why the judge is better at weighing the evidence than the members of the jury. The appellate standard is roughly the same, and appellate judges regularly declare that we who have not even seen the witnesses or the defendant should be extremely restrained when we contemplate announcing that our assessment of the weight of the evidence is superior to that of juries or judges who have seen both.

It seems straightforward enough that Dr. Davidson's testimony and the defendant's own demeanor at the time of the offense support Judge Willis's judgment. Thus, the appellate standard for reversal has not been met. Thompson v. State, 804 N.E.2d 1106, 1149 (Ind. 2004) ("evidence is without conflict and leads only to the conclusion the defendant was insane.")

The majority declares that it is not relevant what may happen as a result of this reversal by appellate judges. Not many of our fellow citizens would not recognize this disclaimer of responsibility as legitimate.

As the majority does acknowledge, there is risk involved when appellate judges second-guess a jury or trial judge and acquit a criminal offender. If Galloway is declared not guilty by this Court, the prosecutor will initiate a civil commitment process to determine whether Galloway should be confined because his mental illness makes him a danger to himself or to others.

2

The one thing we know for sure about Mr. Galloway is that he is in actual fact a danger to others.

We also know what is likely to occur as a result of this Court setting aside Judge Willis's judgment:  sooner or later, probably sooner rather than later, Galloway will be determined safe and turned back into society.

The reason we know that is that the civil commitment process has produced such an outcome over and over again with Mr. Galloway.  The majority has recited the long trail of medical treatments and mental commitments.  It has not focused much in that recitation on how the exercise of expert medical judgments and the civil commitment processes have combined to turn him back out on the street over and over again.

I count perhaps seventeen identifiable encounters by Galloway. But just to name a few, call it number 5, there was a May 1999 event in which Galloway's wife brought him in because he had been carrying around a gun and threatening to use it on his supervisor at work.  This trip produced a prescription for medication and a period of outpatient treatment, then a failure to take his medications and a medical trail gone cold.

During encounter number 7, in April 2001, Galloway was admitted to the hospital because of aggressive and frightening behavior at home.  He said he had been receiving messages from the television.  This interaction with the system produced several months of monitoring during which Galloway took some of his medicines and not others.  And then he was out.

During encounter number 8, Galloway was involuntarily committed because he had threatened to kill his neighbor and his grandmother.  He was released from commitment and then admitted again just a month later, in March 2002.  He stayed a few months at Richmond State Hospital before being declared safe for release.

In encounter number 13, not long before Galloway killed his grandmother, Galloway came under care after he stopped taking his medicines and began reporting hallucinations and recurring thoughts of suicide. After being stabilized, he was discharged to live with his grandmother, with a result plain and painful for all to see.

I mention this litany--just salient elements in an even longer story--to suggest that some innocent future victim is placed at risk by this Court's decision to second-guess Judge Willis. A society that responds to such violence with tolerance should well expect that it will experience more violence than it would if it finally said, "This is unacceptable." Not knowing what I would say to the next victim, I choose to stand with Judge Willis and affirm the judgment of guilty but mentally ill.

Dickson, J., joins.