

FILED

Sep 14 2018, 9:57 am

C L E R K
Indiana Supreme Court
Court of Appeals
and Tax Court

**ATTORNEY FOR APPELLANT**

Jack Quirk
Muncie, Indiana

**ATTORNEYS FOR APPELLEE**

Curtis T. Hill, Jr.
Attorney General of Indiana

Ian McLean
Supervising Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Rodney G. Patterson,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

September 14, 2018

Court of Appeals Case No.
18A-CR-959

Appeal from the Delaware Circuit
Court

The Honorable Kimberly S.
Dowling, Judge

Trial Court Cause No.
18C02-1709-F1-16

**Bailey, Judge.**

# Case Summary

Rodney G. Patterson ("Patterson") was brought to trial on several counts. At trial, Patterson pursued an insanity defense, but the jury found him guilty but mentally ill as to the most serious count of Attempted Murder, a Level 1 felony,[1] and guilty of the remaining counts tried to it. Patterson now appeals.

We affirm.

# Issues

Patterson presents two issues, which we restate as follows:

    I.      Whether his insanity defense should have prevailed; and

    II.     Whether the trial court committed fundamental error in instructing the jury on the insanity defense.

# Facts and Procedural History

On the afternoon of September 1, 2017, Patterson spoke with his apartment manager, Tony Ong ("Ong"), who lived a couple of doors down in Muncie. Ong asked Patterson when he would be paying rent that day, and Patterson said that he would see what he could do. Patterson returned to his apartment.

---

[1] Ind. Code §§ 35-42-1-1, 35-41-5-1(a).

[5] Around 9:00 p.m., Jan Borror ("Borror"), who lived nearby, saw Patterson wearing a closed-faced motorcycle helmet and trench coat, standing still "like a statue" against an exterior wall. Tr. Vol. II at 205. Borror called Ong to tell him about Patterson's behavior. Ong was not very concerned. About thirty minutes later, Ong was inside his apartment when he saw Patterson wearing a motorcycle helmet, peeking in through the storm door. Ong nodded and waved at Patterson, who jerked away. Ong got up, opened the door, and greeted Patterson. Patterson did not respond and turned away. Patterson then turned back and shot Ong in the chest. At that point, Patterson rushed toward the apartment while Ong struggled to get inside. Ong managed to lock the door.

[6] Around this time, a neighbor heard the gunshot and saw Patterson walking away from Ong's apartment. The neighbor yelled out to Patterson, asking about the noise. Patterson looked at the neighbor, then kept walking down the sidewalk and entered his apartment. Both Ong and the neighbor called 9-1-1. Responding officers then formed a perimeter around the building with guns drawn. A police negotiator yelled through a bullhorn speaker, attempting—to no avail—to get Patterson to come out of his apartment. At some point, a gunshot sounded nearby, and law enforcement decided to enter the apartment. Meanwhile, Ong was transported to the hospital and successfully treated.

[7] At the apartment building, a Special Weapons and Tactics ("SWAT") team assembled in a line behind Sergeant Joe Kresja ("Sergeant Kresja"), who was carrying a ballistic shield. The SWAT team approached the apartment, opened the door with a battering ram, and placed a distraction device inside. After the

device detonated, the apartment door was pushed closed from inside. Sergeant Kresja pushed back on the door, entered the apartment, and saw Patterson by the doorframe. When the SWAT team entered, Patterson was wearing a motorcycle helmet with the visor closed, and his hands were stuffed inside his jacket pockets. Sergeant Kresja ordered Patterson to get down, but Patterson did not comply. A struggle ensued, with three officers attempting to handcuff Patterson, who was pushing his hands into his jacket pockets. During the struggle, officers removed a 9mm Taurus firearm from a holster on Patterson's hip. Officers eventually subdued and handcuffed Patterson, who had a 9mm Hi-Point firearm in his left jacket pocket, and two knives attached to his belt.

[8] A search of the apartment produced two identification cards: one issued to Rodney Patterson and another to Kenan Abraman, an alias. The search also produced a receipt showing a transaction the afternoon of the shooting. The receipt, together with firearm transaction records, indicated that Patterson had purchased the Taurus and the Hi-Point earlier that day, under the name Kenan Abraman. In the same transaction, Patterson had purchased ammunition. He also gave untruthful answers in completing a form to obtain the firearms, failing to disclose a prior felony conviction and previous mental health commitments.

[9] The State charged Patterson with (1) Attempted Murder, a Level 1 felony; (2) Unlawful Possession of a Firearm by a Serious Violent Felon, a Level 4 felony;[2]

---

[2] I.C. § 35-47-4-5(c).

(3) Criminal Recklessness, as a Level 5 felony;[3] and Resisting Law Enforcement, as a Class A misdemeanor.[4] Patterson filed a Suggestion of Insanity, and the trial court ordered that Patterson be evaluated by Dr. Frank Krause ("Dr. Krause") and Dr. Craig Buckles ("Dr. Buckles"). After the court held a competency hearing and determined Patterson was competent to stand trial, a jury trial commenced on February 20, 2018. At trial, there was evidence that Patterson suffered from mental health issues: "schizoaffective disorder, bipolar type[;] antisocial personality disorder[;] and some chemical dependence issues." Tr. Vol. IV at 58. There was also conflicting evidence concerning Patterson's sanity at the time of the offenses: Dr. Krause opined that Patterson had been insane while Dr. Buckles opined that Patterson had been sane.

[10] The jury was instructed on the insanity defense as well as the consequences of finding Patterson "not responsible by reason of insanity" or, alternatively, "guilty but mentally ill." App. Vol. III at 121. The jury ultimately rejected Patterson's insanity defense, finding him guilty but mentally ill with respect to Attempted Murder, and guilty of Criminal Recklessness and Resisting Law Enforcement. The jury further found that Patterson had possessed a firearm.

[11] The trial court vacated the count related to possessing a firearm, as "the State could not proceed to phase two of the trial on that charge." Tr. Vol. IV at 205.

---

[3] I.C. § 35-42-2-2(a), -2(b)(2).

[4] I.C. § 35-44.1-3-1(a)(1).

The court also vacated the Criminal Recklessness count because of double jeopardy concerns. On the remaining counts, the trial court imposed a forty-year sentence for Attempted Murder and a concurrent one-year sentence for Resisting Law Enforcement, to be executed in the Indiana Department of Correction. The trial court recommended that Patterson be placed in a correctional facility with a specialized unit offering mental health treatment.

Patterson now appeals.

# Discussion and Decision

## Insanity Defense

"A person may be convicted of an offense only if his guilt is proved beyond a reasonable doubt." I.C. § 35-41-4-1(a). However, "the burden of proof is on the defendant to establish the defense of insanity . . . by a preponderance of the evidence." I.C. § 35-41-4-1(b). Thus, "[a] defendant claiming the insanity defense should have prevailed at trial faces a heavy burden because he or she 'is in the position of one appealing from a negative judgment.'" *Galloway v. State*, 938 N.E.2d 699, 709 (Ind. 2010) (quoting *Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004)). When reviewing such a claim, "we will reverse only when the evidence is without conflict" and leads to a single conclusion: "that the defendant was insane when the crime was committed." *Thompson*, 804 N.E.2d at 1149. In conducting our review, we "will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact." *Myers v. State*, 27 N.E.3d 1069, 1074 (Ind. 2015) (quotation marks omitted).

We will instead "consider only the evidence most favorable to the judgment and the reasonable and logical inferences to be drawn therefrom." *Satterfield v. State*, 33 N.E.3d 344, 348 (Ind. 2015) (quotation marks omitted).

[14] Indiana Code Section 35-41-3-6 sets forth the defense of insanity:

> (a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

> (b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

[15] In challenging the rejection of his defense, Patterson asserts that "[t]he State has the burden of proving sanity beyond a reasonable doubt." Appellant's Br. at 14. However, the Indiana Supreme Court has rejected this proposition. *See Thompson*, 804 N.E.2d at 1149 (explaining that "[t]he State must prove the offense, including *mens rea*, beyond a reasonable doubt but need not disprove insanity"). Patterson also focuses on favorable evidence that would support a determination of insanity. Yet, the evidence on this issue is not without conflict. Rather, the evidence included—*inter alia*—testimony from Dr. Buckles who opined that although Patterson suffered from mental illness he "should have been able to understand that it was wrong for him to shoot another

person." Tr. Vol. IV at 64. In light of conflicting evidence, we cannot say that the jury's rejection of the insanity defense was contrary to law.

## Jury Instructions

[16] Patterson did not object to the jury instructions. Thus, he may now obtain relief only by demonstrating fundamental error, *see Pattison v. State*, 54 N.E.3d 361, 365 (Ind. 2016), which occurs "when the error constitutes a blatant violation of basic principles, the harm or potential for harm is substantial, and the resulting error denies the defendant fundamental due process," *Lewis v. State*, 34 N.E.3d 240, 246 (Ind. 2015) (quotation marks omitted).

[17] Patterson briefly argues that the trial court committed fundamental error by using the phrase "not responsible by reason of insanity" in the jury instructions. *See* App. Vol. III at 115, 121. According to Patterson, the language "not responsible" poses a "substantial potential for harm" in that it "suggests that the Defendant will suffer no consequences if found 'not responsible' and this is a denial of due process because it creates . . . improper conclusions" concerning "the Defendant's future." Appellant's Br. at 16. Patterson asserts that the phrase should instead be "not guilty by reason of insanity." *Id.*

[18] Yet, the trial court expressly instructed the jury on the consequences of finding Patterson not responsible by reason of insanity:

> If the Defendant is found not responsible by reason of insanity at the time of the crime, the prosecuting attorney will file a petition for mental health commitment with the court. The court will hold a mental health commitment hearing at the earliest

opportunity. The Defendant will be detained in custody until the completion of the hearing. If the court finds that the Defendant is mentally ill and either dangerous or gravely disabled, then the court may order the Defendant to be either placed in an outpatient treatment program of not more than ninety (90) days, or committed to an appropriate mental health facility until a court determines commitment is no longer needed.

App. Vol. III at 121. Thus, there was no substantial risk that the jury would, as Patterson suggests, believe that he would "suffer no consequences if found 'not responsible.'" Appellant's Br. at 16. We are therefore not persuaded that Patterson was deprived of due process because of the challenged instruction.

[19] Affirmed.

Mathias, J., and Bradford, J., concur.