**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



**FILED**

Mar 15 2012, 9:13 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**MATTHEW N. FECH**
Griffith, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**GEORGE P. SHERMAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| ERNEST WIREMAN, | ) | |
| | ) | |
| Appellant, | ) | |
| | ) | |
| vs. | ) | No. 75A05-1008-CR-00545 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee. | ) | |

APPEAL FROM THE STARKE CIRCUIT COURT
The Honorable Kim Hall, Judge
Cause No. 75C01-0906-MR-1

**March 15, 2012**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Ernest Wireman ("Wireman") was convicted in Starke Circuit Court of murder, Class A felony attempted murder, and Class B felony arson and ordered to serve an aggregate sentence of 110 years. Wireman appeals his convictions and sentence, and raises four issues on appeal, which we reorder and restate as:

I. Whether Wireman was subjected to fundamental error when psychiatrist Dr. Gregory Hale was allowed to testify that Wireman was not insane when he committed the charged offenses;

II. Whether the jury's verdict of guilty but mentally ill is supported by sufficient evidence;

III. Whether the cumulative effect of the trial court's allegedly erroneous rulings violated Wireman's right to a fair trial; and

IV. Whether the trial court appropriately considered Wireman's mental illness in determining his sentence.

Concluding that Wireman has not established any reversible error, and that the weight afforded to the mental illness mitigating circumstance is not available for appellate review, we affirm.

**Facts and Procedural History**

In the months preceding the commission of the instant offenses, Wireman began to exhibit signs of paranoia to his family members. Wireman believed that he was being followed and watched by members of what he referred to as his "fan club." He also believed that his wife, Mary, was having extramarital affairs. Wireman told members of his family that there were tunnels underneath his trailer, and that men were accessing the trailer through the tunnels and having sexual intercourse with Mary. Wireman believed that these men were drugging him, and saw more than one physician to complain that he

2

was being poisoned. Wireman also told members of his family that Mary was engaged in an incestuous relationship with her son, Jeremy.

On some date in the spring of 2009, Wireman moved out of the trailer and petitioned to have his marriage to Mary dissolved. But prior to June 14, 2009, Wireman moved back into the marital residence and was attempting to reconcile with Mary.

On June 14, 2009, Wireman attended his granddaughters' dance recital. He spoke to Mary's son, Jeremy, and his son, Dale, earlier that day and did not express any delusional or paranoid thoughts during those conversations. But just before the dance recital began, he told his daughter, Andrea, that he recognized vehicles that belonged to members of his "fan club" in the parking lot.

During the recital, Wireman told his family members that he needed to use the restroom. Instead, he left the recital and walked to Andrea's home. Wireman took Andrea's car and drove back to his trailer. Wireman then called Andrea and told her that he had stolen her car. Andrea was upset with Wireman for leaving the dance recital before her daughters performed. Andrea hung up on Wireman, but before she did so, she heard Mary say that no one was following Wireman.

Minutes later, Wireman began to attack Mary with a knife. He also beat her with an electric drill. Kathy Risner, Mary's sister-in-law and neighbor, heard Mary screaming and ran to the trailer. Mary had cuts on her legs and blood on her face. Kathy saw Wireman beating Mary's head with the electric drill, and screamed at him to stop. Wireman, who still had the knife in his other hand, turned around and pointed the knife at

3

Kathy. Wireman told Kathy that if she did not leave, he would kill her next. Kathy ran out of the trailer and told her daughter to call 911.

A few minutes later, Kathy and her husband observed Wireman leaving the trailer. As they ran towards the trailer, they saw smoke and flames. Wireman had used an accelerant to set the trailer on fire, and the flames were so intense that Kathy and her husband were unable to get inside to attempt to save Mary.

After Wireman left the trailer, he drove to Jeremy's home. Wireman entered the home through the back door and told Jeremy to come down to the basement because he needed to show him something. When Jeremy reached the bottom of the basement stairs, Wireman shot him in the stomach and throat. Jeremy managed to flee his home and run to a neighbor's home for help. He was hospitalized for several weeks, but survived the shooting.

Wireman then drove his daughter's car to a field where he abandoned it. At some point thereafter, Wireman's sister and brother-in-law found him walking down the side of a road. Wireman told them to take him to the police station because he killed his wife.

The State charged Wireman with murder, Class A felony attempted murder, and Class B felony aggravated battery. The State later amended the information to include a count of Class B felony arson. After Wireman filed a notice of insanity defense, the trial court appointed a psychologist and psychiatrist to determine his competency to stand trial and whether he was insane on the date he committed the offenses. Wireman was also evaluated by two other psychiatrists, one chosen by the State and one chosen by his counsel.

4

A nine-day jury trial commenced on June 8, 2010. At trial, two psychiatrists and the psychologist concluded that Wireman was insane when he committed the charged offenses. Only the State's psychiatrist, Dr. Gregory Hale, concluded that Wireman was not insane when he murdered his wife and attempted to murder his stepson. The jury found Wireman guilty but mentally ill of murder, attempted murder, arson, and aggravated battery.

Wireman's sentencing hearing was held on July 21, 2010. The trial court merged the aggravated battery charge with the attempted murder charge before imposing Wireman's sentence. The trial court considered as aggravating circumstances that the nature and circumstances of the crime were significant and greater than the elements necessary to prove the commission of the offense, Wireman's criminal history, that Wireman committed attempted murder knowing that young children were present in Jeremy's home, that Wireman murdered Mary immediately prior to attempting to murder Jeremy, and that Wireman set fire to the trailer with the intent to destroy evidence. The trial court considered Wireman's mental illness as a mitigating circumstance and entered several written findings discussing the weight to be afforded to his mental illness.

The trial court then ordered Wireman to serve consecutive terms of sixty years for his murder conviction, forty years for his Class A felony attempted murder conviction, and ten years for his Class B felony arson conviction, for an aggregate sentence of 110 years executed in the Department of Correction. Wireman now appeals. Additional facts will be provided as necessary.

**I. Dr. Hale's Testimony**

5

Wireman claims that the State's psychiatrist, Dr. Gregory Hale, should not have been allowed to render his opinion of Wireman's mental state because Dr. Hale lacked knowledge of Indiana's standard for determining sanity. Specifically, Wireman argues that the State failed to lay the necessary foundation to establish that Dr. Hale's opinion met the evidentiary standards required under Indiana Evidence Rules 403 and 702.

Indiana Evidence Rule 702 titled "Testimony by Experts" provides:

(a) If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
(b) Expert scientific testimony is admissible only if the court is satisfied that the scientific principles upon which the expert testimony rests are reliable.

Evid. R. 702. And Evidence Rule 403 provides that relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading to the jury[.]"

Wireman concedes that Dr. Hale "was competent to testify on the issue of [his] sanity," but claims that he lacked the knowledge or skill to render an opinion on his sanity because he did understand the differences in the legal standards in the possible verdicts in this case, and therefore, allowing the testimony misled the jury. See Appellant's Br. at 23. However, Wireman failed to object to Dr. Hale's testimony on these grounds. Failure to object to the admission of evidence at trial results in waiver on appeal. Warren v. State, 757 N.E.2d 995, 998 (Ind. 2001). Waiver notwithstanding, we conclude that Dr. Hale was qualified to testify and render his opinion of Wireman's sanity when he committed these offenses.

6

At trial, the State elicited testimony from Dr. Hale concerning his educational background and his professional expertise. Dr. Hale testified that he was "familiar with the legal standard for finding insanity" and that he has testified on the issue of insanity in at least four prior cases while consulting on many more. Tr. pp. 1771, 1794. But on cross-examination, the following exchange occurred:

> COUNSEL: Doctor, do you know the distinction, as a forensic psychologist, between the various verdicts that are possible to this jury and this case; that is guilty but mentally ill as opposed to not responsible by reason of mental disease or defect; do you know what the difference between those two verdicts are?
> DR. HALE: …[N]ot specifically. I think I have an understanding of them but –
> COUNSEL: But you don't know what the difference is?
> DR. HALE: I have not seen the statute in front of me or the description of it.
> COUNSEL: And you have not asked anyone to explain the difference to you?
> DR. HALE: I wasn't asked that specific question until, I think you asked me in the deposition.
> COUNSEL: Right. And you didn't know that answer then either.
> DR. HALE: That's right.

Tr. pp. 1822.

Dr. Hale's testimony does not lead to the conclusion that he did not understand the legal standard for a finding of insanity, and in fact, Dr. Hale earlier testified that he did. The logical inference to be drawn from the quoted testimony is that Dr. Hale did not understand the specific differences between the verdicts of guilty but mentally ill and not responsible by reason of mental disease or defect. Moreover, our review of Dr. Hale's testimony leads us to conclude that he understood Indiana's legal definition of insanity and used that definition in formulating his opinion as to whether Wireman was insane when he committed the instant offenses.

7

To prove insanity, the defendant must establish both: (1) that he suffers from a mental illness, and (2) that this mental illness rendered him unable to appreciate the wrongfulness of his conduct at the time of the offense. Galloway v. State, 938 N.E.2d 699, 708 (Ind. 2010) (citing I.C. § 35–41–3–6(a)). Dr. Hale testified that Wireman's mental defect did not impair his ability to tell the difference between right and wrong. Specifically, Dr. Hale stated: "I did not see any evidence to suggest from . . . a psychological standpoint, that he was not aware of what he was doing, and that he did not realize the difference between right and wrong in that particular situation." Tr. p. 1794. Dr. Hale then engaged in a discussion of Wireman's conduct both prior to and during the commission of his offenses, conduct which the doctor believed was evidence indicating that Wireman understood the wrongfulness of his acts. Tr. pp. 1795-96.

From this testimony, we conclude that Dr. Hale understood and applied Indiana's legal definition of insanity in formulating his opinion that Wireman was not insane when he murdered Mary, set fire to their trailer, and attempted to kill Jeremy. For this reason, Wireman has not established reversible error on this issue.

## II. Sufficiency of the Evidence

Wireman also claims that the jury's finding that he was guilty but mentally ill, as opposed to not guilty by reason of insanity, is against the weight of the evidence. To sustain a conviction, the State must prove each element of the charged offenses. See Galloway v. State, 938 N.E.2d 699, 708 (Ind. 2010) (citing Ind. Code § 35-41-4-1(a) (2004)). But even if the State meets this burden, a defendant in Indiana can avoid criminal responsibility by raising and successfully establishing what is commonly

8

referred to as the "insanity defense." Id. (citing Ind. Code § 35-41-3-6(a) (2004)). "A successful insanity defense results in the defendant being found not responsible by reason of insanity [.]" Id. (citing Ind. Code §§ 35-36-2-3, -4 (2004)).

The defendant bears the burden of establishing the insanity defense by a preponderance of the evidence. Id. (citing I.C. § 35-41-4-1(b)). To meet this burden, the defendant must establish both: (1) that he suffers from a mental illness, and (2) that this mental illness rendered him unable to appreciate the wrongfulness of his conduct at the time of the offense. Id. (citing I.C. § 35-41-3-6(a)). "Thus, mental illness alone is not sufficient to relieve [a defendant of] criminal responsibility." Id. (citing Weeks v. State, 697 N.E.2d 28, 29 (Ind. 1998)). Instead, a defendant who is mentally ill but fails to establish that he was unable to appreciate the wrongfulness of his conduct may be found guilty but mentally ill. Id. (citing Taylor v. State, 440 N.E.2d 1109, 1112 (Ind. 1982)).

It is within the province of the jury to determine whether the defendant appreciated the wrongfulness of his conduct at the time of the offense. Id. at 709 (citing Thompson v. State, 804 N.E.2d 1146, 1149 (Ind. 2004)). Indiana Code section 35-36-2-2 provides for the use of expert testimony to assist the jury in determining the defendant's insanity, but the jury has extremely wide latitude and such expert testimony is merely advisory. Id. "[E]ven unanimous expert testimony is not conclusive on the issue of sanity." Id. (citing Cate v. State, 644 N.E.2d 546, 547 (Ind. 1994)). And the jury is free to disregard the unanimous testimony of experts and rely instead on conflicting testimony by lay witnesses. Id. (citing Barany v. State, 658 N.E.2d 60, 63 (Ind. 1995)). Further, even if there is no conflicting lay testimony, the jury is free to disregard or discredit the

9

expert testimony.  Id.  (citing Thompson, 804 N.E.2d at 1149); see also Carson v. State, 807 N.E.2d 155, 161-62 (Ind. Ct. App. 2004).

Because it is the jury's province to weigh the evidence and assess the credibility of witnesses, a finding that a defendant was not insane at the time of the offense warrants substantial deference from reviewing courts.  Galloway, 938 N.E.2d at 709  (citing Barany, 658 N.E.2d at 63).  Therefore, on appeal, the defendant faces "a heavy burden because he or she 'is in the position of one appealing from a negative judgment.'"  Id. (quoting Thompson, 804 N.E.2d at 1149).  On appeal, we will not reweigh evidence, reassess witness credibility, or disturb reasonable inferences made by the trier of fact, even though "more reasonable" inferences might have been made.  Id.  Although this standard of review is deferential, it is not impossible, and our supreme court has long held that "where the defendant claims the insanity defense should have prevailed, the conviction will be set aside 'when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed.'"  Id. at 709-10 (citing Thompson, 804 N.E.2d at 1149; Barany, 658 N.E.2d at 63-64).

In this case, three of the four experts testified that Wireman was insane when he murdered his wife and attempted to murder his stepson.  But Dr. Hale concluded that Wireman was sane when he committed the offenses.  Our supreme court has consistently held that "conflicting credible expert testimony is sufficiently probative of sanity."  See id. at 710 (citations omitted).

To form his opinion of Wireman's sanity, Dr. Hale reviewed the reports of the court-appointed experts, medical records, and other records provided by the State,

10

performed psychological tests on Wireman, and spent several hours interviewing him. Tr. pp. 1772-74. After concluding his evaluation, Dr. Hale found evidence that Wireman suffers from chronic depression, substance abuse, and paranoid thoughts, but "[n]ot so much that he can't function and continue to . . . hold on to a job and engage in relationships and go through marriages and things like that[.]" Tr. p. 1782. Dr. Hale disagreed with the other experts' possible diagnosis of paranoid schizophrenia because of Wireman's ability to maintain employment and relationships with friends and family. Tr. p. 1783.

During his interview with Wireman, Dr. Hale noted a history of domestic violence throughout his life and resentment toward Mary and Jeremy because Mary's granddaughters and Jeremy resided with them. Wireman was unhappy that Mary devoted so much of her time to them. Tr. p. 1790. Ultimately, Dr. Hale concluded that although Wireman suffered from a mental disease or defect, he "did not see any evidence to suggest . . . from a psychological standpoint, that [Wireman] was not aware of what he was doing, and that he did not realize the difference between right and wrong in that particular situation." Tr. p. 1794. Dr. Hale gave several examples of Wireman's behavior on the date the crimes were committed to support his opinion. For example, Dr. Hale gave the following testimony concerning Mary's sister-in-law's presence in the trailer while Wireman was beating Mary:

> DR. HALE: I think it does demonstrate to me that he . . . did know [the difference between right and wrong]. He asked [Kathy] to leave and get out of there and stay away from him.
> STATE: And why would [] asking someone to leave indicate to you that he knew the difference between right and wrong?

11

DR. HALE: Well, first the fact that he recognized her and was aware of her presence and instructed her to do something which was to protect herself, obviously, and get her out of there. But he was aware of the situation and he recognized that person. He wasn't so controlled by his hallucinations or delusion that he didn't have some awareness of what he was doing.

Tr. p. 1799.

Moreover, lay witness testimony established that Wireman did not exhibit signs of mental illness on the date of his crimes. "Lay witnesses who are familiar with and observe the defendant at or around the time of the crime reasonably may be able to give a more accurate account of the defendant's mental state at the time of the crime than experts who examine the defendant months later." Galloway, 938 N.E.2d at 712 (citing Thompson, 804 N.E.2d at 1149). And although demeanor evidence has limits, it is often useful in determining the defendant's sanity because his "'behavior before, during, and after a crime may be more indicative of actual mental health at [the] time of the crime than mental exams conducted weeks or months later.'" Id. (quoting Thompson, 804 N.E.2d at 1149 (citing Barany, 658 N.E.2d at 64)). "[D]emeanor evidence is of more limited value when the defendant has a long history of mental illness with psychosis." Id. at 713. And demeanor evidence before and after a crime is of more limited value than the defendant's demeanor during the crime, as the insanity defense concerns the defendant's mental state while committing the crime. Id. at 714.

Several individuals testified that Wireman did not appear to be suffering from any hallucinations or delusions on the day of the crime. Tr. pp. 460-62, 492-98, 830-31. Wireman made two paranoid comments at the dance recital, but otherwise engaged in normal behavior and conversation with his family members. When Wireman left the

dance recital, he invented an excuse to leave by telling his family members that he had to go to the bathroom. He then walked to his daughter's house and took her car. Immediately prior to his attack on Mary, Wireman called his daughter and told her that he had stolen her car. Tr. p. 614. When Mary's sister-in-law attempted to stop Wireman's attack on Mary, Wireman pointed his knife at her and stated that if she did not leave, he would kill her next. Wireman also used an accelerant near the computer room where he killed Mary to start the fire in his trailer.

Wireman then proceeded to his stepson's house, and knowing that children were present in the house, asked Jeremy to meet him in the basement. When Jeremy reached the bottom of the basement stairs, Wireman shot him twice. Wireman then fled, and abandoned his daughter's vehicle in a field miles away from Jeremy's home. When he was discovered walking along the side of a roadway by his sister and brother-in-law, Wireman told them to take him to jail because he had killed his wife.

All of this evidence supports the jury's decision to reject Wireman's insanity defense and find him guilty but mentally ill. The evidence at trial supports the conclusion that Wireman suffered from a mental disease or defect, but the evidence was conflicting as to whether he was unable to appreciate the wrongfulness of his conduct at the time of the offense. It was within the province of the jury to weigh this conflicting evidence and assess the credibility of the witnesses, and we will not second guess the jury's determination on appeal. For these reasons, we conclude that the jury's verdicts finding Wireman guilty but mentally ill of murder, arson and attempted murder are supported by the evidence.

13

### III. Fair Trial

Wireman also claims that the "cumulative effect of various rulings by the court resulted in [] Wireman not receiving a fair trial." Appellant's Br. at 28. "[U]nder some circumstances the cumulative effect of trial errors may warrant reversal even if each might be deemed harmless in isolation[.]" Hubbell v. State, 754 N.E.2d 884, 895 (Ind. 2001); see also Gaby v. State, 949 N.E.2d 870, 882 (Ind. Ct. App. 2011); Lainhart v. State, 916 N.E.2d 924, 938-39 (Ind. Ct. App. 2009).

Wireman first argues that the trial court erred when it "limit[ed] voir dire to only ten [minutes] per side." Appellant's Br. at 28. This claim is a gross misstatement of the record. For each prospective panel of twelve jurors, the trial court began the questioning by asking the jurors about their personal lives, i.e. marital status, number of children, citizenship, employment, group associations, etc. Each party was then given ten minutes to ask follow-up questions about the jurors' personal lives. The parties were also permitted to submit questions to the trial court that they wanted asked during voir dire. Finally, each party was also given another ten minutes to question the jurors on any subject matter they wished. Voir dire consists of over 300 transcribed pages of the record.

Wireman has not established any error in the trial court's manner of conducting voir dire. And, even if we were to determine that error occurred, Wireman has not made any specific argument to address how he might have been prejudiced.

Wireman next argues that the trial court erred by "insist[ing] that the [defense's] evidence be presented in a more speedy fashion" after the State was allowed eight days to present its case-in-chief. Appellant's Br. at 29. Wireman claims that "[p]ushing the

14

defense in such a fashion had a detrimental effect on Mr. Wireman's ability to present a complete defense and was unreasonable." Id. at 30. But Wireman does not provide any specific examples of how the trial court's request impacted his ability to present a complete defense. And Wireman did not argue at trial that he was unable to present certain evidence and never asked for additional time. For these reasons, we cannot conclude that the trial court erred in making such a request, and even if it was error, Wireman has not established any prejudice.

Finally, Wireman argues that the trial court erred by allowing testimony concerning Wireman's bad acts; specifically, that Wireman had abused alcohol in the past and had a bad temper. But our supreme court has held that "'[a] plea of insanity opens the door for the admission of testimony about the defendant's entire life[.]'" Robinette v. State, 741 N.E.2d 1162, 1166 (Ind. 2001) (quoting Shepherd v. State, 547 N.E.2d 839, 841 (Ind. 1989) (holding that evidence of the defendant's prior bad acts, which included stealing items from several individuals, mistreating a dog, attacking a football coach, and threatening a youth care worker, was properly admitted because the defendant had raised an insanity defense)). Therefore, there was no fundamental error in the admission of testimony concerning Wireman's past alcohol abuse and bad temper.

Wireman has not established any error in the trial court's voir dire procedure, its request that defense counsel present its evidence as quickly as possible, or in the admission of testimony concerning Wireman's prior bad acts. We therefore reject Wireman's cumulative error claim because the trial court did not commit any error to

15

begin with. See <u>Kimbrough v. State</u>, 911 NE.2d 621, 641 n.10 (Ind. Ct. App. 2009) (citing <u>Forgey v. State</u>, 886 N.E.2d 16, 22 (Ind. Ct. App. 2008)).

## IV. Sentencing

The trial court ordered Wireman to serve consecutive (but less than maximum) terms of sixty years for his murder conviction,[1] forty years for his Class A felony attempted murder conviction,[2] and ten years for his Class B felony arson conviction,[3] for an aggregate sentence of 110 years executed. On appeal, Wireman requests that we revise and reduce his sentence.

Wireman was found guilty but mentally ill; therefore, the jury necessarily concluded that Wireman suffers from mental illness or deficiency but remains capable of discerning right from wrong. Ind. Code § 35-36-2-3 (2008). "Mentally ill" for these purposes means "having a psychiatric disorder which substantially disturbs a person's thinking, feeling, or behavior and impairs the person's ability to function[.]" Ind. Code § 35–36–1–1 (2008). For the purposes of this appeal, it is important to note that the "difference between guilty and guilty but mentally ill does not compel a difference in sentencing." <u>Baer v. State</u>, 942 N.E.2d 80, 90 (Ind. 2011) (citing Ind. Code § 35–36–2–5(a) (2008 & Supp. 2010)).

---

[1] Indiana Code section 35-50-2-3 provides that "[a] person who commits murder shall be imprisoned for a fixed term of between forty-five (45) and sixty-five (65) years, with the advisory sentence being fifty-five (55) years."

[2] Indiana Code section 35-50-2-4 provides that "[a] person who commits a Class A felony shall be imprisoned for a fixed term of between twenty (20) and fifty (50) years, with the advisory sentence being thirty (30) years."

[3] Indiana Code section 35-50-2-5 provides that "[a] person who commits a Class B felony shall be imprisoned for a fixed term of between six (6) and twenty (20) years, with the advisory sentence being ten (10) years."

In imposing Wireman's sentence, the trial court considered his mental illness as a mitigating circumstance and entered thirty findings discussing the weight to be afforded to his mental illness. Ultimately, the trial court concluded,

> When assigning the amount of weight to be given the mitigating fact of the Defendant's mental illness, the court has considered that the Defendant had a psychiatric disorder which substantially disturbed his thinking. However, the court has also considered that many of the Defendant's thoughts, feelings, and behavior were entirely consistent with an ordinary criminal, of average intelligence, who desired to commit murder, attempted murder, and arson, and that he had the functional ability to carry out those criminal acts. Furthermore, the Defendant clearly appreciated the wrongfulness of his conduct and was capable of formulating thoughts that were entirely consistent with an ordinary murderer who was attempting to flee from capture and incarceration by law enforcement officers.

Appellant's App. p. 146. The court then concluded that "the weight to be given this mitigating factor is considerable and substantial, but not great." Id.

Although the trial court's refusal to consider a mitigating circumstance clearly supported by the record may be reviewed on appeal, an appellant's claim that his mental illness is entitled to more mitigating weight is no longer an available argument on appeal. See Anglemyer, 868 N.E.2d 482, 491 (Ind. 2007). Accordingly, we will not consider Wireman's argument that the trial court failed to accord adequate mitigating weight to his mental illness during the sentencing proceedings.

Also, citing former Appellate Rule 17(B), Wireman argues that his 110-year aggregate sentence is "manifestly unreasonable" because the trial court failed to "give proper mitigating weight to Mr. Wireman's mental illness." Appellant's Br. at 24. But this has not been the applicable standard for several years. Rather, the applicable standard is enumerated under Indiana Appellate Rule 7(B).

17

Specifically, although a trial court may have acted within its lawful discretion in imposing a sentence, Article 7, Sections 4 and 6 of the Indiana Constitution authorize independent appellate review and revision of a sentence imposed by the trial court. Alvies v. State, 905 N.E.2d 57, 64 (Ind. Ct. App. 2009) (citing Anglemyer, 868 N.E.2d at 491). This appellate authority is implemented through Indiana Appellate Rule 7(B), which provides that a court "may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender." Anglemyer, 868 N.E.2d at 491.

However, "we must and should exercise deference to a trial court's sentencing decision, both because Rule 7(B) requires us to give 'due consideration' to that decision and because we understand and recognize the unique perspective a trial court brings to its sentencing decisions." Stewart v. State, 866 N.E.2d 858, 866 (Ind. Ct. App. 2007). The burden is on the defendant to persuade us that his sentence is inappropriate. Reid v. State, 876 N.E.2d 1114, 1116 (Ind. 2007). Finally, although we have the power to review and revise sentences, "[t]he principal role of appellate review should be to attempt to leaven the outliers, and identify some guiding principles for trial courts and those charged with improvement of the sentencing statutes, but not to achieve a perceived 'correct' result in each case." Cardwell v. State, 895 N.E.2d 1219, 1225 (Ind. 2008).

The nature of Wireman's offenses was particularly gruesome. Wireman used a knife to cut Mary's legs before brutally beating her in the head with an electric drill, which ultimately caused her death. He then set fire to their trailer using an accelerant and

18

the fire was started near the room where Mary's body was located. Wireman then drove to his stepson's residence, and knowing that young children were present in the home, asked Jeremy to meet him in the basement of the home. When Jeremy reached the bottom of the staircase, Wireman attempted to murder him by shooting him in the throat and stomach. Jeremy survived the shooting but was hospitalized for several weeks during his recovery.

Although Wireman's mental illness certainly contributed to his decision to murder his wife and attempt to kill his stepson, the evidence presented at trial established that Wireman knew what he was doing was legally wrong. For all of these reasons, we conclude that Wireman's aggregate 110-year sentence is not inappropriate in light of the nature of the offense and the character of the offender.

**Conclusion**

Wireman failed to establish any trial error that would entitle him to reversal of his convictions on appeal and sufficient evidence established that he was not insane when he committed the offenses at issue in this case. Moreover, Wireman's 110-year aggregate sentence is not inappropriate in light of the nature of the offense and the character of the offender.

Affirmed.

FRIEDLANDER, J., and RILEY, J., concur.