Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



ATTORNEY FOR APPELLANT:

**KIMBERLY A. JACKSON**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN MCLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DONALD WILLIAM MYERS, III, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 76A03-1305-CR-173 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE JOHNSON CIRCUIT COURT
The Honorable Allen Wheat, Judge
Cause No. 76C01-0404-FA-411

**April 14, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**MATHIAS, Judge**

Donald Myers ("Myers") was convicted in Steuben Circuit Court of four counts of Class A felony attempted murder and sentenced to an aggregate term of 120 years incarceration. Myers appeals and presents five issues, which we restate as the following three dispositive issues: (1) whether the jury clearly erred in rejecting Myers's insanity defense; and 2) whether the trial court abused its discretion in admitting evidence of Myers's post-arrest silence and request for counsel to prove Myers's sanity. We hold that in the absence of any admissible evidence of probative value that even inferred sanity at the time of the crimes, the jury clearly erred in rejecting Myers's insanity defense. We further hold that the trial court abused its discretion in allowing the State to present evidence of Myers's post-arrest silence and request for counsel as alleged proof of his sanity. For these reasons we reverse Myers's convictions.

**Facts and Procedural History**

Myers has suffered from serious mental health issues since he was nineteen or twenty years old. In 2000, he was diagnosed with schizophrenia and placed on a regimen of anti-psychotic medications. From 2001 to 2004, Myers was periodically hospitalized when he decompensated, or failed to take his medications. Sometime in April 2004, Myers again decompensated. On April 28, 2004, Myers's mother, Judy Weininger ("Weininger"), with whom Myers shared a mobile home in the Silver Lake Trailer Court in Steuben County, called Myers's psychiatrist to report that Myers had stopped taking his medications. In response, Myers's psychiatrist authorized a bed for Myers at a local mental health center. However, when Weininger attempted to persuade Myers to get into her car to go to the mental health center, Myers refused.

2

On the evening of the following day, April 29, 2004, David Brown ("Brown"), his wife, Vickie, and their grandson were driving through the Silver Lake Trailer Court when they heard a loud gunshot. Brown looked around the trailer park and observed a man, later identified as Myers, standing between two trailers and holding a long gun, later identified as a shotgun. Brown accelerated his car quickly out of the trailer park and onto the adjacent U.S. Highway 20. As he drove away and called 911, Brown saw the man running alongside U.S. 20, still carrying the gun. The man again pointed the gun at Brown's car, and Brown heard the sound of a second gunshot. Brown later noticed a small indentation on the side of his car and a white substance on the back window of his car. No one in Brown's car was injured.

That same evening, around 9 p.m., Desmond Augenstein ("Augenstein") was driving westbound on U.S. 20, near the Silver Lake Trailer Court, when he passed a man, later identified as Myers, walking east in the middle of the highway. Augenstein thought that the man had been struck by another car, so he turned around to drive back toward the man. As Augenstein approached, however, he saw that the man was holding a long gun. Augenstein turned his car back around to escape. When he looked in his rearview mirror, he saw the man aim the gun at Augenstein's car. The man fired two shots. Neither of the shots hit Augenstein's car, but Augenstein heard the pellets "zipping" past his window. Tr. pp. 236-37. Augenstein called 911 to report the incident.

Indiana State Police Trooper Lionel Smith ("Trooper Smith") received a radio dispatch about a man shooting a gun at motorists on U.S. 20. Trooper Smith drove his marked police cruiser along U.S. 20 until he spotted Myers on the shoulder of the road.

3

As Trooper Smith approached Myers in his cruiser, Myers lifted his gun and fired towards the driver's side window of Trooper Smith's car. The pellets from Myers's gun struck the cruiser's driver's side door and window, the exterior of the car's roof, and the car's light bar. Trooper Smith was not injured and the only damage to his car was caused by two pellets lodged in the rubber sill above the driver's side window. Smith parked his cruiser across the highway to block traffic, retrieved his service shotgun, and positioned himself behind his car. He ordered Myers to drop his weapon, but Myers ignored Trooper Smith and began to walk in the opposite direction. With his shotgun drawn, Trooper Smith pursued Myers on foot.

Steuben County Sheriff's Department Sergeant Phillip Knott ("Sergeant Knott") also heard the radio dispatch about gunshots in the trailer court and along U.S. 20. As he drove towards the scene, he received an additional radio message from Trooper Smith reporting that a man had fired a gun at Smith's car. Sergeant Knott soon arrived at the location of Trooper Smith's car, parked his own vehicle next to Smith's car, and joined Smith's foot pursuit of Myers.

Indiana State Police Trooper Terry Ghent ("Trooper Ghent"), who had also heard the initial 911 dispatch regarding the gunfire, soon arrived in the area through which Trooper Smith and Sergeant Knott were pursuing Myers. When he realized that Myers was positioned between himself and the other responding officers, Trooper Ghent positioned his cruiser across the highway to block traffic. As Myers walked towards Ghent, still carrying the shotgun, Ghent ordered Myers to stop. Myers ignored Trooper Ghent and continued to walk towards him. Ghent fired his service pistol at Myers,

4

striking him in the shoulder. Trooper Smith also fired two shots at Myers, and Sergeant Knott fired four to five shots at Myers. Myers then ran away from the road, down an embankment, and into a nearby wooded area.

The officers moved their vehicles to the area in which Myers had disappeared and turned on their headlights to illuminate the brush. They fanned out on foot to attempt to locate Myers and prevent his escape. A SWAT team arrived shortly thereafter, and, for the next several hours, a police negotiator attempted to persuade Myers to surrender. Myers's younger brother also urged Myers to surrender. However, Myers remained hidden in the brush. At one point, the officers could see the burning tip of a cigarette as Myers smoked.

The officers deployed six cans of tear gas into the area where Myers was located, but he still refused to surrender. Eventually, the police drove an armored Humvee into the wooded area, stopped several feet from Myers, and ordered him to raise his hands in the air. Shortly after midnight, about three hours after he had entered the wooded area, Myers surrendered. He had suffered gunshot wounds to the shoulder and groin. The 20-guage shotgun Myers had been carrying was recovered. Five shotgun shells fired from his gun were found in Myers's vest, along with an unfired shotgun shell.

Myers was taken into custody and transported to a local hospital where he underwent surgery for his wounds. Tr. pp. 298, 306, 308. An officer was posted outside Myers's hospital room while he was recovering. During this time, police officers attempted to obtain a statement from Myers, but Myers refused. While he was in the hospital, Myers told his mother that he wanted a lawyer.

5

The day after the incident, April 30, 2004, the State charged Myers with Class D felony criminal recklessness and six counts of Class A felony attempted murder. Approximately two weeks later, on May 11, 2004, the trial court conducted an initial hearing. At the hearing, Myers refused to answer the trial court's questions.

On June 1, 2004, Myers filed a notice of defense of mental disease or defect. The trial court appointed two physicians, Dr. David Lombard and Dr. John Rathbun, to evaluate Myers's competency to stand trial. Later that month, both physicians reported that Myers was not competent to stand trial. On August 20, 2004, the trial court found Myers to be incompetent and remanded him to the care and custody of the Division of Mental Health and Addiction Services for placement in a mental health care facility. Myers was placed in the Isaac Ray Unit of the Logansport State Hospital.

Less than eight months later, on April 5, 2005, the superintendent of the Logansport State Hospital certified that Myers "will not attain the ability to understand the proceedings and assist in the preparation of his defense in the foreseeable future." Appellant's App. p. 71. The hospital's conclusion as to Myers's incompetence was based on a forensic interview with Myers, his medical records, a review of the police reports from April 29, 2004, and a review of Myers's previous competency evaluation. The hospital's report concluded, "Mr. Myers continues to be delusional and psychotic and continued long-term treatment will be needed at this point," and, further, due to his delusions and psychosis, "it is highly questionable" that he would be able to assist his attorney in his own defense. Appellant's App. pp. 253-54. The same day, the trial court issued an order for the commencement of regular commitment proceedings and removed

6

the case from the court's docket, subject to reinstatement if Myers ever regained competency to stand trial.

Some four years later, on June 2009, the Logansport State Hospital reported to the trial court that Myers had regained competency to stand trial. Thereupon, the trial court ordered Myers to be transferred from the hospital to the Steuben County jail.

On April 1, 2010, Myers filed a notice of intent to assert insanity defense and request for evaluation. On April 8, 2010, the trial court appointed two physicians, Dr. David Lombard and Dr. Herbert Trier to evaluate Myers's competency to stand trial and to determine whether Myers suffered from a mental disease or defect at the time of the alleged offense. On July 14, 2010, Myers filed a pro se motion for dismissal. In his motion, he argued that his right to a speedy trial had been violated. The trial court denied Myers's motion "due to its then set trial date of June 28, 2010." On July 29, 2010, the trial court issued an order remanding Myers to the Division of Mental Health and Addiction Services and noting that both Dr. Lombard and Dr. Trier had determined that Myers was incompetent to stand trial. Myers was returned to the Logansport State Hospital.

On November 19, 2010, the Logansport State Hospital filed a report with the trial court indicating that Myers had not regained competency to stand trial and requesting that the trial court extend Myers's commitment for ninety days so that Myers could receive additional psychiatric services. The trial court granted the hospital's request. Then, on February 1, 2011, the Logansport State Hospital's interim superintendent certified that Myers would not attain competency to stand trial in the foreseeable future, just as the

7

Logansport superintendent had done some six years earlier. At this time, the hospital commenced regular commitment proceedings.

One year later, on February 29, 2012, Myers was transferred to Richmond State Hospital. Four months after that, on June 21, 2012, Richmond State Hospital's superintendent reported to the trial court that Myers had regained competency to stand trial, noting that Myers had been on a regime of anti-psychotic medications for over a year and "has been stable on it." Appellant's App. p. 282.

On April 9, 2013, the State filed a motion to dismiss Count I, criminal recklessness, and Counts V and VI, attempted murder. The trial court granted the motion on the same day. Myers's three-day jury trial began a week later, on April 16, 2013. During the trial, Myers testified in his own defense. He stated that he was a Marine, that he had worked at the Pentagon, and that he was friends with former President George W. Bush. He further testified that he worked with the "NSA" and the "SIG" to eradicate "some groups of devil worshipers who entered into the service called Koi [and the] Magic Cult." Tr. p. 492. He stated:

> And Koi would demand that we all be gay with each other or come and be gay with them. And they didn't want to be gay because they would be guilty under the law of Magic. So, ah, they would fight each other all the time . . . they had this strange belief that anybody that smoked marijuana was going to go to hell if they died. So they would kill people who smoke marijuana and [steal] all their drugs and take 'em out of there and put, like, robot in place for a couple of days so they could get more drugs and money and kill a few more people and then they burn the place down, collect insurance on it, and get out of town.

Tr. p. 493.

8

He testified that on April 29, 2004, he heard voices that told him he deserved to "go to hell for killing people who practice magic." Tr. p. 495. Myers denied carrying a gun or ammunition on the night of the offenses. Instead, he claimed, he possessed a fake gun called a "blast" which was used by the NSA in "war games." Tr. p. 489. He stated that he was "on duty" that night and was shot by the police ten times while he was walking to a McDonald's restaurant. He stated that a police officer stopped him as he walked, asked for identification, told him that he could leave, and then shot him. He believed that he was being shot by the police in an assassination attempt. Myers also claimed that he was stabbed in the arm and groin area with two different knives. He testified that, while he was in the hospital following his arrest, he was tortured with a Taser gun by the DEA and FBI.

At trial, Dr. Trier testified that, based on his June 2010 interview with Myers, his review of Myers's hospital records, his review of the notes of other psychiatrists and psychologists who had evaluated Myers, and his review of the probable cause affidavit, he had determined that Myers was legally insane and did not appreciate the wrongfulness of his conduct on April 29, 2004. Dr. Lombard, a clinical psychologist employed by the State of Indiana, testified that based on his clinical interviews with Myers, psychological testing, and his review of the probable cause affidavit, he had also determined that Myers was insane on April 29, 2004. He further testified that the psychological testing conducted on Myers was designed to detect malingering or feigned mental health symptoms and that the results indicated that Myers was not feigning his delusions.

9

Despite this unanimous professional medical testimony, indeed in four different reports by three different psychiatrists over a period of nine years during which Myers was hospitalized in the State's mental health system, and Myer's own nonsensical testimony at trial, the jury rejected Myers's insanity defense and returned verdicts of guilty but mentally ill on all four counts of attempted murder. On April 29, 2013, exactly nine years after Myers's offense, the trial court held a sentencing hearing. At the hearing, Myers requested that the court consider as mitigating factors that he had not injured any person and that he had a long history of mental illness. The trial court ordered Myers to serve four consecutive terms of thirty years, with credit for 3,287 days of pre-sentence incarceration, for an aggregate sentence of 120 years.

Myers now appeals.

## Discussion and Decision

## I. The Insanity Defense

"The existence of a scienter requirement is customarily an important element in distinguishing criminal from civil statutes." Wallace v. State, 905 N.E.2d 371, 381 (Ind. 2009) (quoting Kansas v. Hendricks, 521 U.S. 346, 362 (1997)). The conviction of an individual who acts without the necessary *mens rea* "strikes squarely against the principles of fairness and due process." Greer v. State, 643 N.E.2d 324, 326 (Ind. 1994). Insanity at the time of the crime negates the element of scienter or intention needed to convict one of a crime. Truman v. State, 481 N.E.2d 1089, 1089-90 (Ind.1985).

Myers argues that the jury clearly erred "in finding Myers guilty but mentally ill, rather than not responsible by reason of insanity at the time of the crime." Appellant's Br.

10

at 31. He claims that "the evidence in this case leads to only one conclusion—that Myers was legally insane at the time of the offenses." Id. at 32.

Even where the State meets the burden of proving each element of the charged offense beyond a reasonable doubt, a defendant can avoid criminal responsibility by successfully raising and establishing the "insanity defense," which results in the defendant being found not responsible by reason of insanity. See Ind. Code §§ 35-41-3-6(a); 35-36-2-3-4. The defendant bears the burden of establishing the insanity defense by a preponderance of the evidence. See Ind. Code § 35-41-4-1(b). To meet this burden, the defendant must establish that (1) he suffers from a mental illness and (2) the mental illness caused him to be unable to appreciate the wrongfulness of his conduct at the time of the offense. When a defendant is found to be not guilty by reason of insanity, Indiana Code section 35-36-2-4 requires that the prosecuting attorney file a written petition for commitment with the court and that the trial court hold a commitment hearing. Double jeopardy principles from the Fifth Amendment of the U.S. Constitution bar a second trial for such a defendant. State v. Berryman, 796 N.E.2d 741 (Ind. Ct. App. 2003) trans. granted, opinion aff'd in part, vacated in part.[1]

Whether a defendant appreciated the wrongfulness of his or her conduct at the time of the offense is a question for the trier of fact. Thompson v. State, 804 N.E.2d 1146, 1149 (Ind. 2004). Therefore, a finding that a defendant was not insane at the time

---

[1] Myers has been and remains institutionalized in a secure facility within Indiana's mental health system. Unless new psychotropic medications sufficient to treat his serious mental illness are developed, he will likely remain institutionalized for the rest of his life.

[2] See Galloway v. State, 938 N.E.2d 699, 714 (Ind. 2010) ("[D]emeanor evidence before and after a

11

of the offense warrants substantial deference from reviewing courts. See id. This court will not reweigh evidence, assess witness credibility, or disturb reasonable inferences made by the trier of fact. Thompson, 804 N.E.2d at 1149-50. However, although the standard of review is very deferential, the defendant's conviction will be set aside "when the evidence is without conflict and leads only to the conclusion that the defendant was insane when the crime was committed." Thompson, 804 N.E.2d at 1149.

Indiana Code section 35-36-2-2 provides for the use of expert testimony to assist the trier of fact in determining the defendant's insanity. Such expert testimony, however, is advisory, and even unanimous expert testimony is not necessarily conclusive on the issue of the defendant's sanity. Cate v. State, 644 N.E.2d 546, 547 (Ind. 1994). The trier of fact may disregard the unanimous testimony of experts and rely instead on the conflicting testimony of lay witnesses. Barany v. State, 658 N.E.2d 60, 63 (Ind. 1995). Even where there is no conflicting lay testimony, the trier of fact is free to disregard or discredit the expert testimony. Thompson, 804 N.E.2d at 1149.

In the present case, both of the mental health experts who testified at trial had evaluated Myers at the request of the trial court. The experts not only repeatedly found Myers to be incompetent to stand trial, even after years of psychiatric treatment and hospitalization, but they both unwaveringly and unanimously concluded, based on their meetings with Myers as well as their review of his medical records and the probable cause affidavit, that he was not able to appreciate the wrongfulness of his behavior on the night of April 29, 2004. Both experts further testified that Myers has a long history of serious mental illness, including delusions and paranoid schizophrenia. Dr. Lombard

12

testified that the psychiatric testing he conducted on Myers was designed to detect malingering or feigning of psychiatric symptoms, and that the results revealed that Myers was not feigning his mental illness.

Importantly, the testimony of Dr. Lombard and Dr. Trier was not in conflict with the facts of the case. Myers's mother testified as to Myers's history of mental health problems, his hospitalizations, and his periodic failures to take his prescribed anti-psychotic medications, which had again occurred at the time of the offense. Myers's mother further testified that Myers was "not in his right mind" on the day of the offenses. Tr. p. 458. None of the victims or responding officers offered any testimony indicating that Myers was sane. Myers shot at a marked police car, and when he was struck with police bullets, he fled into the brush, where he later lit a cigarette, thus revealing his location. He refused to surrender, even though he had suffered multiple gunshot wounds and even when assaulted with tear gas. There was no evidence of a plan or motive. He reported that he was "on duty" that night, that he was shot, stabbed, and beaten by the police in an assassination attempt, and he denied carrying a gun. Appellant's App. p. 239. Myers's demeanor and testimony at trial—where he stated that he had been a member of the military since birth, that he had been subjected to brainwashing, torture, and assassination attempts, that he was friends with President George W. Bush, that he had heard voices, and that he was working with intelligence groups to eradicate imaginary cults—provided further evidence of the depth of his mental illness. See Manuel v. State, 535 N.E.2d 1159, 1162 (Ind. 1989) (per curiam) (noting that a defendant's demeanor during court proceedings is probative evidence of sanity with regard to his or her

13

competence to stand trial). Simply said, there was no testimony, lay or otherwise, that contradicted the testimony of two psychiatrists that Myers was insane *at the time of* his crime.

## II. Admission of Myers's Mother's Testimony

Furthermore, there was no properly admitted evidence that Myers was sane *immediately prior to or following* his crime.[2] At Myers's trial, during cross-examination of Myers's mother, and outside the presence of the jury, the State elicited testimony that Myers had refused to speak with police officers while he was in the hospital recovering from his gunshot wounds and that, when speaking with his mother, he had requested an attorney. Over defense counsel's objection, the trial court admitted the evidence, stating, "We'll permit the State to make enquiry [sic] of the defendant's request for an attorney in hearing the issue of his, ah, mental state on or about the time at issue in this case." Tr. pp. 472-73. On cross-examination, the State questioned Myers's mother as to the nature of Myers's desire for counsel. She answered, "To sue 'em. To sue them for shootin' at him because he asked me why did they shoot me Mom, they knew me, who I was." Tr. p. 473. When the jury returned, the following exchange occurred between the State and Myers's mother:

> Q: And Donnie told you at time that he wanted a lawyer, isn't that also true? Is that true?
>
> A: After he started getting better I came down . . .

---

[2] See Galloway v. State, 938 N.E.2d 699, 714 (Ind. 2010) ("[D]emeanor evidence before and after a crime is of more limited value than the defendant's demeanor during the crime" because "[t]he insanity defense concerns the defendant's mental state at the time of the crime.").

Q: Did Donnie tell you at the time that he wanted a lawyer?

A: I probably ask'd [sic] him if he wanted a lawyer.

Q: Did Donnie tell, did Donnie tell you at the time that he wanted a lawyer?

A: I'm sure that when I asked him if he wanted a lawyer he said yes. He didn't want to talk to the police.

Q: He didn't want to talk to the police, he wanted a lawyer, correct?

A: I would assume that's, yeah.

Tr. pp. 474-75.

During closing arguments, the prosecutor commented on Myers's refusal to speak with police and his request for an attorney, stating:

> He been to places before, he knew he was mentally ill, and he, and he knew he could use this cause he had the ability to know that. He told his mother, I, this is one (1) of the questions she really didn't want to answer, and I asked her three (3) or four (4) times, he told his mother he wanted to lawyer. This is just in the hospital sometime shortly after the shooting down at Parkview. Because he didn't want to talk to the police. Okay. And I think Ms., Ms. Wagoner came back on cross and, and, and, and, and, and well was it really for some type of civil suit? Well, that's not what the mother said, she agreed with that then, of course, but that's not what she said. He wasn't wanting to talk to the police. What does that tell ya? That, that gives us a little glimpse into the, because this is an issue, right, his mind, this is at issue that he, he, he doesn't wanna make a statement, he doesn't wanna make a statement to the police. Because maybe he's aware of what he did was wrong, right?

Tr. p. 577.

The Fifth Amendment of the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself[.]" U.S. Const. amend. V. In <u>Miranda v. Arizona</u>, 384 U.S. 436, 468 n. 37 (1966), the United

15

States Supreme Court held that, pursuant to the Fifth Amendment, "it is impermissible to penalize an individual for exercising his Fifth Amendment privilege when he is under police custodial interrogation."

Ten years after issuing its opinion in Miranda, the United States Supreme Court decided Doyle v. Ohio, 426 U.S. 610, 619 (1976). In Doyle, the Court held that "the use for impeachment purposes of petitioners' silence, at the time of arrest and after receiving Miranda warnings, violated the Due Process Clause of the Fourteenth Amendment." The Court explained, "while it is true that the Miranda warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings." Id. at 618.

In Wainwright v. Greenfield, 474 U.S. 284 (1986), the United States Supreme Court ruled that the government's use of the accused's post-Miranda silence as evidence of his sanity violated the due process clause of the Fourteenth Amendment. Justice Stevens, writing for seven members of the Court, was persuaded that the reasoning in Doyle prohibiting the State from using a defendant's post-Miranda silence to impeach the defendant's exculpatory testimony was also applicable when the State used the defendant's silence as evidence of the defendant's sanity.

Like the United States Supreme Court, the Indiana Supreme Court has found violations of the rule in Doyle where the jury hears evidence of the defendant's silence and that evidence is used to belie a claim of insanity. See Lynch v. State, 632 N.E.2d 341, 341 (Ind. 1994) (Doyle violation where trial court instructed jury that tape of defendant's initial police interrogation was to be used for the limited purpose of

16

establishing defendant's state of mind soon after the crime and where tape showed discussions regarding defendant's Miranda rights and defendant's invocation of his right not to be questioned without an attorney); Wilson v. State, 514 N.E.2d 282, 283 (Ind. 1987) (finding a Doyle violation where detective testified that defendant indicated he wanted to talk to a lawyer before continuing interview and prosecutor referred to those statements in closing argument to rebut insanity defense: "Shows you that he knew, he understood what [the detective] was saying.").

In its appellate brief, the State emphasizes that there is no evidence that Myers received a Miranda warning after his arrest and prior to his refusal to speak with police and his request for counsel. The State further contends that Myers's request for counsel was made to his mother, not a government agent, and, thus, the rules set forth in Doyle and Wainwright do not apply. We disagree. It is apparent that Myers invoked his right to remain silent and made his request for counsel while he was in custody. Having been arrested at the scene, and with a police officer standing guard outside his hospital room, no reasonable person would have felt free to leave the hospital. See Berkemer v. McCarty, 468 U.S. 420, 440 (1984) (holding that the safeguards prescribed by Miranda become applicable as soon as a suspect's freedom of action curtailed to a "degree associated with formal arrest"). Indeed, at least two officers testified that Myers was "taken into custody" immediately after Myers surrendered. Tr. pp. 298, 306, 308.

The United State Supreme Court has held that "[t]he warnings mandated by [Miranda are] a *prophylactic* means of safeguarding Fifth Amendment rights," but they are not the *genesis* of those rights. Doyle, 426 U.S. at 617, 96 S.Ct. 2240 (emphasis

17

added).  Once the government places an individual in custody, that individual has a right to remain silent and a right to counsel.  Id; see also Griffin v. California, 380 U.S. 609, 614, 85 S.Ct. 1229, 14 L.Ed.2d 106 (1965).

Therefore, in applying the holdings in Doyle and Wainwright, we conclude that both the admission of the evidence of Myers's post-arrest silence and request for counsel and the prosecutor's closing argument thereon as evidence of his sanity are a violation of Myers's constitutional rights to silence and to counsel.  The entire purpose of this evidence was to demonstrate that Myers's post-arrest silence and request for counsel constituted lucid and reasonable behavior, demonstrating an understanding of the nature and quality of Myers's actions, in contradiction of Myers's claim of insanity.  In sum, the trial court abused its discretion in allowing the State to use Myers's refusal to speak with police and his request for counsel as substantive evidence of his sanity, and, therefore, his guilt.  It is this type of conduct that Doyle and Wainwright prohibit.

Such constitutional error requires reversal unless it is harmless beyond a reasonable doubt.  See Brown v. State, 446 N.E.2d 354, 357 (Ind. Ct. App. 1983).  In the case before us, the jury was presented with expert testimony that Myers was insane at the time he committed the crime, followed by testimony from Myers's mother elicited by the State to prove that Myers was sane.  This question of constitutional error, then, pertains to a crucial fact on which the outcome of this case hinges, Myers's state of mind at the time of the offense and immediately after the offense.  Therefore, we are unable to say that the trial court's error in admitting the evidence of Myers's silence and request for counsel was harmless.  See Robinette v. State, 741 N.E.2d 1162 (Ind. 2001) (concluding that the

18

admission of evidence of murder defendant's post-Miranda silence, which the State offered to rebut insanity defense, was not harmless error where defendant offered substantial testimony that she suffered from a condition causing her to be unable to recall or appreciate the crimes she committed, and her videotaped statements, in which she repeated, "I don't want to talk about it," could have left jurors with the impression that defendant was sane enough to recognize that it was not to her benefit to speak with police). Considering the jury's ultimate determination that Myers was mentally ill but able to appreciate the wrongfulness of his conduct, rather than not guilty by reason of insanity, the potential for harm was substantial. Thus, the admission of this evidence to prove Myers's sanity was reversible error.

Our review of the record, then, does not reveal *any* properly admitted lay testimony, or expert testimony, or demeanor evidence that could justify rejection of Myers's proffered insanity defense. See Galloway v. State, 938 N.E.2d 699 (Ind. 2010) (holding that where testifying experts unanimously agree that the defendant was insane at the time of the offense, there must, in order to create a fact issue, be other evidence of probative value, usually lay opinion testimony or demeanor evidence, from which a conflicting inference of sanity can be drawn, that, when considered in light of the other evidence, permits a reasonable inference of sanity to be drawn). With absolutely no evidence of probative value from which an inference of sanity could be drawn sufficient to create a conflict with the unanimous expert testimony, lay opinion testimony, and demeanor evidence indicating that Myers was insane at the time of the offence, the jury clearly erred in rejecting Myers's insanity defense. Because Myers was insane at the

19

time of his offense, he was incapable of forming the requisite *mens rea* or intent to commit the crimes charged, and indeed, to commit any crime. We therefore reverse his convictions.

## Conclusion

The trial court abused its discretion in admitting evidence of Myers's refusal to speak with police and his request for counsel and the jury clearly erred in rejecting Myers's insanity defense. Accordingly, we reverse Myers's four Class A felony attempted murder convictions.

Reversed.

FRIEDLANDER, J., and PYLE, J., concur.