FILED

May 06 2020, 7:54 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court



ATTORNEY FOR APPELLANT

Jonathan D. Harwell
Harwell Legal Counsel LLC
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Megan M. Smith
Deputy Attorney General
Indianapolis, Indiana

IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Romello Webb, <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff* | May 6, 2020 <br><br> Court of Appeals Case No. <br> 19A-CR-1358 <br><br> Appeal from the <br> Hendricks Superior Court <br><br> The Honorable <br> Stephenie LeMay-Luken, Judge <br><br> Trial Court Cause No. <br> 32D05-1807-F2-15 |

**Vaidik, Judge.**

## Case Summary

[1]     Romello Webb was convicted of Level 2 felony attempted robbery resulting in serious bodily injury and Level 3 felony attempted robbery resulting in bodily injury in connection with a shooting during a drug-deal-gone-bad. Based on the

evidence presented at trial, including discrepancies in the evidence about Webb's car and hair, the lack of physical evidence connecting Webb to the offenses, and the fact that the victim never identified Webb as the shooter, we find that the evidence is insufficient to prove that Webb was the shooter and therefore reverse his convictions.

# Facts and Procedural History

[2] In December 2017, Jesse Speck messaged Ean Edwards, a student at Brownsburg High School, on Snapchat about purchasing marijuana. Speck got Edwards's name from Steven Garcia. When Speck later met up with Edwards, he took the marijuana from him and "drove off instead of" paying. Tr. Vol. II p. 123.

[3] About two months later, on February 8, 2018, Speck and his half-brother, Geoffrey Krick, were looking to buy some marijuana. Speck asked Garcia for a name because his dealer quit selling, and Garcia gave him the Snapchat username "geoffcarr1211." *Id.* at 100; Ex. 36. Around 8 p.m. on February 8, Speck messaged "geoffcarr1211" on Snapchat about purchasing some marijuana, and "geoffcarr1211" agreed to sell Speck half an ounce. Tr. Vol. II pp. 97, 99. Speck then gave "geoffcarr1211" Krick's phone number (because his phone did not have service), and around 9:50 p.m. Speck received a text message on Krick's phone to meet in the Shiloh Creek neighborhood in Avon.

[4] When Speck and Krick arrived at the meeting location, Speck saw a "burnt orange" Dodge Challenger parked on the street. *Id.* at 98; *id.* at 134 (Speck "fully believe[d]" the car was "burnt orange"); *see also id.* at 155; Tr. Vol. III pp. 91, 142 (Krick describing the car as "red"). Speck pulled in front of the Challenger and parked. Tr. Vol. II p. 98. A few minutes later, a black male wearing a hoodie opened the passenger-side backdoor and sat behind Krick. Speck's and Krick's descriptions of this black male differed: Speck said he had an "afro" and glasses, and Krick said he had "dreadlocks" with no mention of glasses. In any event, Speck was "sketched out," because "geoffcarr1211's" Snapchat profile reflected a white male with curly strawberry-blonde hair. *Id.* About thirty seconds later, a second man with an AK-47 opened the driver-side backdoor and sat behind Speck. This man had a "hood on but his hair was very puffy . . . like an afro," and he wore a cloth on his face from the nose down. *Id.* at 109. Speck asked, "Do you have that?," and the first man pulled out a gun, pointed it at Speck and Krick, and said, "Yeah, I got that." *Id.* at 108. Speck threw his wallet at the men and asked them what they wanted. At about the same time, a third man opened Speck's door. This man had "bushy" hair with a hoodie pulled over his head and wore a cloth on his face from the nose down. *Id.* at 111. Speck "believe[d]" this man to be Edwards, whom he stole marijuana from in December. *Id.* at 125. When this third man reached for the keys, Speck tried to put his car in drive. However, the first man leaned forward and put the car in neutral. As Speck and Krick fought the men and Krick reached for their guns, the first man's gun went off, shooting Speck in the back. Krick's hand was injured in the process. According to Speck and Krick, only

one shot was fired. *Id.* at 117; Tr. Vol. III p. 136. After the gun went off, the third man ran back to the Challenger. Speck put his car in drive and drove off with the first and second men still in the car. Krick fought the men until they got out of the car and back into the Challenger, which then sped off.

[5] Krick got into the driver's seat and drove Speck to IU Health West Hospital in Avon. Hendricks County Sheriff's Deputy Jordan Laforet was the first officer to arrive at the hospital. He immediately spoke with Krick to get a description of the shooter so police could be on the lookout. Krick described the shooter as a black male with "dreads" wearing a hoodie; he did not mention glasses. Tr. Vol. II p. 157. Medical personnel determined that the bullet entered Speck's back, penetrated his lung, and exited his chest. Speck was transferred to IU Health Methodist Hospital, where he remained in the ICU for about a week.

[6] Detective Charles Tyree of the Hendricks County Sheriff's Department led the investigation. Shortly after the shooting, Detective Tyree searched Speck's car, and no guns, shell casings, or bullet holes were found. Tr. Vol. II p. 221. Around midnight, Detective Tyree spoke with Krick at the sheriff's department and had him write down his version of the events. According to Krick's statement, the shooter had "dreadlocks" and was wearing a hoodie. Tr. Vol. III p. 92; Ex. B. Again, Krick did not mention glasses. Around 2:00 a.m., an assisting detective, Detective Scott Larsen, went to IU Health Methodist Hospital to speak with Speck, who described the shooter as a black male in his late teens with "an afro and glasses." Tr. Vol. III p. 40.

[7] Speck and Krick turned over their phones to police. Detective Tyree determined that Speck and Krick had been communicating with Geoffrey Carr, a student at Brownsburg High School, on February 8 and got a search warrant for Carr's phone and phone records. *Id.* at 227. The search of Carr's phone and phone records led Detective Tyree to seventeen-year-old Webb, who was also a student at Brownsburg High School and "best friends" with Edwards. *Id.* at 238.

[8] Detective Tyree then got a search warrant for Webb's phone. Detective Tyree received Webb's phone records from AT&T in April 2018. *See* Ex. 64. He then sent them to the Indiana State Police Cyber Crime Unit for analysis, and the Cyber Crime Unit produced an extraction report. *See* Ex. 30.

[9] Detective Tyree learned that Webb's mother had rented a black Dodge Challenger from Enterprise. Tr. Vol. III p. 15; *see also* Ex. 69 (Enterprise paperwork describing the rental car as "gray"). The rental period was February 5 to 8, but the car was not returned until February 10. Tr. Vol. III p. 16. When the car was returned, there was a hole in the middle of the windshield. *Id.* at 56; Exs. 92-93. Detective Tyree searched the Challenger in July, over five months after the shooting, and found two 45-caliber bullets and a shell casing underneath the carpeting of the front passenger seat and one 45-caliber bullet

underneath the backseat.[1]  According to Enterprise, the Challenger was likely rented "many" times between February 10 and when Detective Tyree searched it in July.  Tr. Vol. III p. 60.

[10]  In July 2018, the State charged Webb with Level 2 felony attempted robbery resulting in serious bodily injury (Speck), Level 3 felony attempted robbery resulting in bodily injury (Krick), and Level 3 felony aggravated battery (Speck).[2]

[11]  A three-day jury trial was held in April 2019.  The State's theory was that Webb, Edwards, and an unidentified male were the three men in the Challenger and that Webb was the shooter.[3]  Speck testified, but Carr and Edwards did not.  Krick was called as a defense witness but failed to appear, so his deposition was read into the record.  Tr. Vol. III p. 115.  The State presented no physical evidence linking Webb to the shooting, such as a gun, bullet, shell casing, fingerprints, or DNA.  Speck testified that he was never given an opportunity to identify the shooter before trial, such as using a lineup or photo array.  Instead,

---

[1] The jury asked Detective Tyree if he spoke with Speck's doctors about whether "his wounds [were] consistent with a [45-]caliber bullet wound," and Detective Tyree responded that he "did not speak with doctors or Mr. Speck about the specifics of the size of his wound."  Tr. Vol. III p. 111.

[2] The State charged Edwards with Level 2 felony attempted robbery (Speck), Level 3 felony attempted robbery (Krick), and Level 3 felony attempted robbery (both men).  *See* 32D05-1808-F2-16.  The State charged Edwards with all three crimes as an accomplice.  Edwards pled guilty to Level 2 felony attempted robbery in May 2019, after the trial in this case.  It doesn't appear that Carr was charged in connection with this case.

[3] According to the State's closing argument in this case, "[t]here's no evidence that Geoffrey Carr was actually there at the shooting."  Tr. Vol. III p. 173.

Speck said he was only asked to describe the shooter. Tr. Vol. II p. 131. Speck said he didn't know the identity of the shooter until Detective Tyree told him it was Webb. Tr. Vol. II p. 135. According to Krick's deposition, which was read to the jury, Detective Tyree showed him a photo array, and he circled a couple "could-bes." Tr. Vol. III p. 126. However, the photo array was "lost or destroyed," so it was not known who Krick circled. *See* Appellant's App. Vol. II p. 104.

[12] During his testimony, Speck described the shooter as a black male wearing a hoodie and black-rimmed glasses. Although Speck told Detective Larsen shortly after the shooting that the shooter had an "afro," Speck gave no description of the shooter's hair at trial. During his direct examination, Speck testified that "Romello Webb" entered the car first and that the person who entered the car first had a gun. Tr. Vol. II pp. 105, 108. The following exchange then occurred:

> Q Now . . . you're calling the man with the pistol Romello Webb?
>
> A Uh, yes, I know him to be the one (1) with the pistol because of his glasses.
>
> Q What was it about . . . his glasses that helped you to do that?
>
> A Uh, he was wearing the glasses that night and I remember strictly [sic] having black-framed glasses.

*Id.* at 110.

[13]     The State offered into evidence Exhibits 94 and 95, which show Webb "wearing his glasses." Tr. Vol. II p. 131. Here is Exhibit 95, cropped to focus on Webb:



In addition, the school resource officer at Brownsburg High School testified that Webb's glasses, which he was wearing in court, were "distinctive." Tr. Vol. III p. 68. However, the school resource officer did not say what was distinctive about the glasses.

[14]     The State's case against Webb rested heavily on evidence from Webb's phone and the fact that he was friends with Carr and Edwards. The State admitted into evidence Webb's phone records from AT&T and the extraction report

prepared by the Cyber Crime Unit. These records contain incoming and outgoing phone calls and text messages. According to these records, Carr called Webb at 3:40 p.m. on February 8. Tr. Vol. II p. 243; Ex. 64 p. 83. In addition, at 10:56 p.m. on February 8, about an hour after the shooting, Webb received a text message from Edwards stating, "Appreciate you brother." Ex. 30; Tr. Vol. III p. 12. At 11:34 p.m., Webb received a text message with an address to an auto-glass repair shop. And the following morning at 7:17 a.m., Webb received the following text message, "Aye don't tell nobody what happen last nite !! Not even yo friends." Ex. 30; Tr. Vol. III p. 13. The State presented no evidence as to who sent these last two messages to Webb. Finally, Webb texted with his mother and Edwards on February 9 about replacing a windshield. Ex. 30; Tr. Vol. III pp. 22-24.

[15] Webb's phone records also included location data. Detective Tyree took this location data, which consists of latitude and longitude coordinates and location accuracy, and plugged them into a Microsoft program called "Streets and Trips" to create maps showing Webb's whereabouts around the time of the shooting. Tr. Vol. II pp. 244-45; Exs. 65-68. Detective Tyree admitted this was the first time he had done any "mapping" and that he had no training.[4] Tr. Vol. II p. 245. According to Detective Tyree, Webb was at his home in Brownsburg around 8:43 p.m. on February 8. Ex. 65. At 9:54 p.m., Webb was about fifty

---

[4] Webb objected to the admission of Exhibits 65-68 on grounds that Detective Tyree was "not properly trained" on mapping, but the trial court overruled his objection. Tr. Vol. II p. 246. Webb does not raise this issue on appeal.

meters from the location of the shooting in Avon. Ex. 66. The shooting occurred around 10:00 p.m. And at 11:05 p.m., Webb was back home. Ex. 68.

[16] Webb presented evidence that he had short hair around the time of the shooting and for at least nine years before then. Tr. Vol. III pp. 156, 158; Ex. D. Webb also presented evidence that he had never had dreadlocks. Tr. Vol. III p. 157. The State presented no evidence to contradict this. The jury was instructed, among other things, that it could "infer that evidence of the photo array [shown to Krick] would have been favorable to" Webb. Appellant's App. Vol. II p. 104. During closing arguments, the State argued to the jury that "the most compelling evidence" was not Speck's and Krick's testimony but rather the cell-phone evidence. Tr. Vol. III p. 172. The State acknowledged the discrepancies about the color of the car and the description of the shooter but argued that it was a "darkly lit night" and Speck and Krick had guns "pointed at [them]." *Id.* at 178. Defense counsel emphasized that only one of the two victims showed up at trial and argued that Speck, the one who showed up, did not identify Webb as the shooter. *Id.* at 185 (Defense counsel: "[Speck] never really pointed at Romello Webb, just kind of said yeah, because he was involved. He never said hey, that's him. That's the guy."). Defense counsel highlighted that there was "[n]o gun, no DNA, no fingerprints, no ID" and erroneous descriptions of Webb's car and hair. *Id.* at 188. The jury found Webb guilty of both counts of attempted robbery but hung on the aggravated-battery count. The trial court sentenced Webb to seventeen years for Level 2 felony attempted robbery (seven years executed and ten years of work release) and eight years for Level 3 felony

attempted robbery (all to be served on home detention), to be served consecutively.

[17]    Webb now appeals.

# Discussion and Decision

[18]    Webb contends that the evidence is insufficient to support his convictions. When reviewing sufficiency-of-the-evidence claims, we neither reweigh the evidence nor judge the credibility of witnesses. *Willis v. State*, 27 N.E.3d 1065, 1066 (Ind. 2015). We will only consider the evidence supporting the verdict and any reasonable inferences that can be drawn from the evidence. *Id.* A conviction will be affirmed if there is substantial evidence of probative value to support each element of the offense such that a reasonable trier of fact could have found the defendant guilty beyond a reasonable doubt. *Id.*

[19]    Again, the State's theory was that Webb was the shooter. During closing argument, it briefly suggested that Webb was guilty as an accomplice even if he wasn't the shooter: "If, for some reason, you don't believe that Mr. Webb was the one (1) with the handgun, but he participated in this offense, he's guilty . . . of the same charges that everyone else is because they knew what they were doing." Tr. Vol. II pp. 179-80. On appeal, the State abandons the accomplice theory and focuses solely on Webb being the shooter. Appellee's Br. p. 21 (arguing that the jury could have reasonably inferred that "Edwards, Carr, and

Webb set up Speck to be robbed in retaliation for stealing marijuana from Edwards, and that Webb was the shooter"). Therefore, the only issue before us is whether the evidence is sufficient to prove beyond a reasonable doubt that Webb was the shooter. We hold that it is not.

[20] To begin, Speck and Krick consistently described the assailants' car as burnt orange/red, not black, and their descriptions of the shooter do not match Webb. The State describes these as "minor discrepancies." *Id.* at 22. We disagree. The identity of the shooter was the focus of the investigation. Immediately after the shooting, Deputy Laforet went to IU Health West Hospital to speak with Krick. Deputy Laforet wanted to get a description of the shooter so police could act quickly to apprehend him. Krick described the shooter as a black male with "**dreads**" wearing a hoodie but did not mention glasses. Around midnight, about two hours after the shooting, Detective Tyree met with Krick at the sheriff's department. Again, Krick described the shooter as having "**dreadlocks**" and wearing a hoodie, with no mention of glasses. Around 2:00 a.m., Detective Larsen spoke with Speck at IU Health Methodist Hospital, and Speck described the shooter as a black male in his late teens with "**an afro and glasses**." After getting a warrant for Geoffrey Carr's phone and phone records, the investigation focused on Webb. Detective Tyree, however, did not show Speck a photo array to see if he could identify the shooter. *See* Tr. Vol. III p. 95 (Detective Tyree: "I thought that it best not to do a photo array."). Although Detective Tyree showed Krick a photo array and Krick circled a couple "could-bes," the photo array was "lost or destroyed," and the jury was

instructed that it could infer that Krick did not identify Webb. In short, neither victim identified Webb as the shooter before trial.

[21] Webb presented evidence, unchallenged by the State, that he had short hair around the time of the shooting (and for at least nine years before then) and that he has never had dreadlocks. During his testimony, Speck described the shooter as a black male wearing a hoodie and black-rimmed glasses. Despite telling Detective Larsen shortly after the shooting that the shooter had an "afro," Speck gave no description of the shooter's hair at trial. The State contends that "Speck identified Webb as the shooter at trial." Appellee's Br. p. 20. We disagree. It is true that Speck testified that he "kn[e]w" Webb was the shooter, but his only basis for saying so was that the shooter was wearing "black-framed glasses" that, according to Speck, looked like the glasses Webb was wearing during trial. Tr. Vol. II p. 110. In essence, Speck was saying "the shooter was wearing glasses that looked like the glasses of the person sitting at the defense table." That is a far cry from saying "the person who shot me is the person sitting at the defense table"—and Speck said nothing of the sort. At best, Speck identified the shooter's style of glasses, not the shooter himself. Moreover, State's Exhibit 95 shows Webb wearing glasses, and there is nothing particularly unique about them.[5]

---

[5] Notably, the charging information against Webb alleges that he was wearing a mask. *See* Appellant's App. Vol. II pp. 19-20. At trial, the State did not present any evidence that the first man/shooter was wearing a mask.

[22]     In addition, there is no physical evidence linking Webb to the offenses.  The State presented no gun, bullet, shell casing, fingerprints, or DNA.  Instead, the State presented four pieces of non-incriminating evidence.  First, the State presented evidence that Webb was best friends with Edwards and friends with Carr.  Specifically, the State notes that Webb received a phone call from Carr at 3:40 p.m. on February 8.  While this is true, the evidence shows that Speck did not communicate with Carr about purchasing marijuana until later that night.

[23]     Second, the State presented text messages that Webb received after the shooting.  At 10:56 p.m. on February 8, about an hour after the shooting, Webb received a text message from Edwards stating, "Appreciate you brother."  And the following morning at 7:17 a.m., Webb received the following text message, "Aye don't tell nobody what happen last nite !!  Not even yo friends."  The State presented no evidence as to who sent this last message to Webb.  These vague text messages do not establish that Webb knew about the shooting, let alone that he was the shooter.

[24]     Third, the State presented evidence that the black Dodge Challenger rented by Webb's mother had a hole in the windshield when it was returned to Enterprise on February 10 and that bullets were found in the rental car five months after the shooting.  Setting aside the color differences in the Challenger (burnt orange/red vs. black) and even assuming that the hole in the windshield was from a bullet, the State presented no evidence that the hole in the Challenger's windshield was connected to the events in this case.  The evidence presented at trial was that only one shot was fired—the shot that hit Speck.  And while no

evidence was presented as to where the bullet went after exiting Speck's chest, Detective Tyree searched Speck's car and found no bullet hole. In other words, the State presented no evidence that the bullet exited Speck's car, much less that it entered the Challenger's windshield. Moreover, Speck testified that he parked in front of the Challenger. Speck was sitting in the driver seat and was shot from behind. As for the 45-caliber bullets found in the Challenger in July, not only was that car likely rented numerous times in the intervening five months, but the State presented no evidence as to what caliber of bullet was used in the shooting.

[25] Fourth, the State presented evidence from Detective Tyree that at 9:54 p.m. on February 8, Webb was about fifty meters (164 feet) from the location of the shooting. But even if Webb was near the scene of the shooting, this evidence does not establish that he was the shooter.

[26] While we seldom reverse for insufficient evidence, we have an affirmative duty to make certain that the proof at trial is sufficient to support the verdict beyond a reasonable doubt. *Bean v. State*, 818 N.E.2d 148, 150 (Ind. Ct. App. 2004). Some time ago, our Supreme Court described proof beyond a reasonable doubt as follows:

> The rule of law defining proof beyond a reasonable doubt has been well settled for many years and requires each juror to be so convinced by the evidence that as a prudent man he would feel safe to act upon such conviction in matters of the highest concern and importance to his own dearest and most important interests, under circumstances where there was no compulsion or coercion

upon him to act at all. The standard of a prudent man is that of a reasonable man. If different persons might reasonably arrive at different conclusions from that reached by the trial jury, the verdict will not be set aside for that reason. On the other hand if no reasonable man could find the evidence has proved an accused guilty beyond a reasonable doubt, a verdict would not be sustained by sufficient evidence.

*Baker v. State,* 236 Ind. 55, 61, 138 N.E.2d 641, 644-45 (1956) (citations omitted), *overruled on other grounds by Davis v. State,* 249 Ind. 373, 232 N.E.2d 867 (1968).

[27] Although the sufficiency-of-the-evidence standard of review is deferential, it is not impossible to overcome, nor should it be. Our Supreme Court has observed that the Indiana Constitution guarantees "in all cases an absolute right to one appeal." *Galloway v. State,* 938 N.E.2d 699, 709 (Ind. 2010), *reh'g denied*. An impossible standard of review under which appellate courts merely "rubber stamp" the fact-finder's determinations, no matter how unreasonable, would raise serious constitutional concerns because it would make the right to an appeal illusory. *Milam v. State*, 14 N.E.3d 879, 881 (Ind. Ct. App. 2014).

[28] Given the discrepancies in the evidence about Webb's car and hair, the lack of physical evidence connecting Webb to the offenses, the fact that Speck never identified Webb as the shooter, the vague text messages, and the fact that the location information does not establish that Webb was the shooter, we find that

the proof at trial is not sufficient to support the verdicts beyond a reasonable doubt. We therefore reverse Webb's convictions.[6]

[29] Reversed.

Mathias, J., and Tavitas, J., concur.

---

[6] Webb also argues that the trial court erred in admitting certain hearsay evidence and that his sentence is inappropriate. Even considering the evidence that Webb challenges, we still conclude that the evidence is insufficient to support his convictions. And in light of our conclusion that the evidence is insufficient to support Webb's convictions, we do not address his inappropriate-sentence argument.